**THE LOUISE.**

No. 2570.

District Court, D. Maryland.

Oct. 21, 1943.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and F. Herbert Prem, both of New York City, and Lord & Whip, of Baltimore, Md., of counsel), for intervening cargo libellants Atlas Powder Co., Sociedad Anonima Petrola las Mercedes, and New Gold Fields of Venuzuela, Ltd.

Bernard J. Flynn, U. S. Atty., and Thomas J. Kenney, Asst. U.S. Atty., both of Baltimore, Md., for intervening cargo libellants, Arundel Corporation, Hardaway Contracting Co., and Consolidated Engineering Co., Inc.

Sol. C. Berenholtz, of Baltimore, Md., for William G. Kelly and others.

John H. Skeen and Charles F. Stein, Jr., both of Baltimore, Md., for claimant-respondent.

CHESNUT, District Judge.

In the above case I have made separate findings of fact and conclusions of law with respect to (1) the cargo claims and (2) the wage claims. I think the findings will be found in sufficient detail both as to ultimate facts and evidentiary facts, to tell. the whole story; but I will add a few general comments.

The vessel was clearly unseaworthy at the start of the voyage, and a considerable part of the damage to the cargo was caused by this unseaworthiness. Some of the testimony was by deposition and some in open court. Taken together it established the unseaworthiness of the ship beyond any reasonable doubt.

As to the cargo loss, and the liability of the ship therefor, it is admitted that the carriage was subject to the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq. By it the burden of proof is on the shipper to show unseaworthiness, and when this has been shown the burden of proving the exercise of due diligence to make the ship seaworthy and thus escape the consequences of the loss, is put upon the ship. In this case the shipowner's principal contention is that he did exercise due diligence; but I find from the whole evidence that he did not.

The ship had a wooden hull, 167 feet long, 28 foot beam and 13 feet depth, and was 530 tons gross. She was built in 1922 at Milford, Delaware, and had been first used as a trawler, but for 15 years prior to 1942 had been tied up at a dock in Baltimore. In 1941 she was surveyed

for insurance or purchase or both by Capt. Schillp, a marine surveyor of long experience. He reported adversely on her condition and said that he found her timbers so affected throughout with dry rot that she was a "dead ship". In 1942 she was purchased by the present owner, the owner-claimant in this case, for $20,000. He obtained an estimate from the Bethlehem Company of $150,000 to repair and re-equip her. He considered this estimate extravagantly high and proceeded to have repairs made to her hull largely under his own supervision. He had had little if any practical experience with ships as for many years he had been engaged in New York as an importer of merchandise, which business was substantially discontinued on the outbreak of the war. He expended about $30,000 in repairs to the hull and about $40,000 in new equipment, etc., thus making his total investment in the vessel about $90,000.

To support the owner's contention that he exercised due diligence to make the ship seaworthy, he relies principally on the fact that he obtained a so-called "load line certificate" and also an official marine inspection certificate before the ship sailed from Baltimore to take on its cargo at Philadelphia, Pennsylvania, and Wilmington, Delaware. The surveyor who acted in the matter of the load line certificate was called as a witness. No doubt he was a competent man but his testimony given in court did not impress me with the thoroughness of the particular inspection. The official marine survey and certificate was under the official superintendence and responsibility of Commander Cabernagel of the local Coast Guard. His personal testimony in court was very convincing that the particular certificate was issued by mistake or inadvertence probably due to insufficient personnel in his office at the time, which was some months after the beginning of the present war. It is unnecessary to discuss this in detail. Of course these certificates are entitled to very considerable weight but I reached the conclusion after hearing the testimony that they were not conclusive; and the evidence as a whole satisfied me that sufficient care had not been taken in the particular case as a basis for the issuance of the certificates.

The shipowner's duty to make the ship seaworthy was a non-delegable duty and furthermore there was sufficient evidence in the case to show that some of the repairs ordered by the assistant to Commander Cabernagel had not been properly done.

Counsel for the shipowner relies largely on the proposition that as all the bills of lading were issued to the Atlas Powder Company (although the consignees and the ports of delivery were varied), the carrier in this case should be treated as a private and not a common carrier, with the result that the burden of proving negligence on the part of the carrier causing loss was upon the cargo owners. See Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89. I think it very doubtful indeed whether, in the circumstances of this case, especially as the shipment was explicitly made subject to the Carriage of Goods by Sea Act by endorsement of the paramount clause on the bills of lading, the burden of proof to show lack of due diligence on the part of the shipowner, was imposed on the cargo claimants. But even if it was, that is immaterial in this case because, after all the evidence had been submitted, I was satisfied from a preponderance of the evidence that the shipowner had not exercised due diligence to make the ship seaworthy for the voyages contemplated.

It is urged that the ship left the convoy not by reason of her unseaworthy condition but because she could not keep up with the convoy and was ordered to leave by the convoy master; but I find the true fact to be that in the condition the ship was in she was unable to safely encounter the not unusual weather that prevailed at the time she left the convoy; and that her leaving the convoy was due to her particular condition and not to orders of the convoy master.

As to the wage claims, I think the testimony in the case fully supports the contention of the members of the crew that they are entitled in addition to what they received when paid off at Baltimore (under their protest) to a full month's extra wages, and the further special payment promised them of $100 each to stay by the ship on the voyage back to Baltimore from Norfolk. Looking at the condition of the ship when she left Norfolk after her return from the convoy and the fact that she was loaded with dynamite which may have been damaged by sea water (a fact afterwards ascertained upon unloading in

Baltimore) I find that the promise of the owner to pay the extra compensation was based on adequate and fair consideration. His entry on the log that he agreed to pay the extra compensation under duress is not fairly supported by the evidence.