## THE RIO NOVO.

District Court, S. D. New York.
March 29, 1945.

Horace T. Atkins, by William Weymar, Jr., both of New York City, for libellant.

Haight, Griffin, Deming & Gardner, by Herbert M. Statt, and John T. Casey, all of New York City, for "Rio Novo"

BONDY, District Judge.

After reading the transcript of the stenographer's minutes of the trial, I adhere to the opinion expressed at the trial.

The master of the "Rio Novo" testified that before the nuts were loaded thereon they had been screened alongside his ship, that when they were put aboard they apparently were clean, dry and sound, that he did not see any that were wet or mouldy and that had he observed any that were wet or mouldy he would have made a notation on the bills of lading to that effect.

In the bills of lading covering the shipment it is stated that the nuts were shipped "in apparent good order and condition" and that they were "to be delivered in like good order and condition at the port of New York." Stamped on the bills of lading was the statement "Actual condition unknown, liable to deterioration." It is also stated that the carrier shall not be liable for loss or damage arising from the nature of the goods, that the shipment is subject to the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., and to the exemption from liability contained in the Act of Congress of the United States approved on the 13th of February, 1893, 46 U.S.C.A. § 190 et seq.

The master also testified that he had never before been on a ship that carried Brazil nuts, that every day during the voyage he looked at the nuts and noticed that some were sweating more than others, that the trimmers would pick out any bad nuts and throw them overboard and that he first

saw mould on them when their discharge was started.

A witness in the employ of the plaintiff corporation as an examiner, testified that on her arrival at Staten Island he boarded the "Rio Novo", that the nuts showed an unusual amount of sweat, that on their discharge on the dock there was heat in the nuts, that they were in a dangerous condition, that they showed green mould and white mould and had to be shovelled to get the heat out of them, that he notified the ship's agent and that following instructions he engaged three or four men to shovel them right away, who culled the very bad nuts that were yellow and mouldy from the sweat.

Another witness in the employ of the libellant who examines and passes on all merchandise brought by the libellant, and who has been handling Brazil nuts for about 30 years, testified that the nuts were "very sweaty, and some were wet and mouldy" and most lots contained heat, that when he saw them he saw that he had to go right to work to save as many as possible, and he gave instructions not to spare any expense but to go right ahead and turn them over and that he knew that trouble had started when he saw the heat and mould, which was more than average and more than usual.

The evidence discloses that the "Rio Novo" was seaworthy, well ventilated, well equipped and fit for the carriage of delicate Brazil nuts, that the nuts were properly stowed in all bins and that there was no negligence in the care of the nuts other than failure to trench them sufficiently.

Loading of the nuts was begun June 19, 1940, at Manaos. The log does not disclose whether each bin was fully loaded at one time, or whether the bins were only partially loaded at a time, with the effect that the loading at different times might have served the same purpose as trenching, by exposing different nuts to the air in the hold when so loaded.

The master testified that although the nuts were trimmed, they were not trenched during the loading of the ship between June 19th and July 2d, that two trimmers employed at Manaos July 2d, when the ship sailed, trenched from 7:00 A.M. to 5:00 P.M. every day after the ship left Manaos, until the ship arrived at Para on July 6th, where he took on another trimmer because he found the work would be too much for two men and that it was too hot for two trenchers to do the trenching during the whole voyage. Although the log discloses that the trimmers trenched on certain days and omits to state anything about trenching on other days, the master testified that he saw the trimmers trench every day and that they would trench all compartments at least every second day.

The ship sailed from Para July 8th and reached the port of New York July 21st. It discharged some of its cargo in Jersey City between July 22d and July 24th, and discharged the rest of her cargo, including the nuts involved in this suit, at Staten Island between the 25th and 29th of July.

The evidence does not disclose whether or not any of the nuts were left in any of the bins untrenched during the greater part of such time.

The nuts were delivered otherwise than in apparently good external condition. They were delivered wet and mouldy. They received very little if any trenching during the two weeks that the ship was at Manaos. The proof as to the trenching while in transportation is not very satisfactory. The probability is that the nuts were of the current season's crop. They were delicate and probably would have disclosed an apparent change in external condition if they had been kept in the jungle over a season.

It is not probable that the ship's agent would have been notified and the owners would have incurred the expense of shoveling and trenching in the way in which they did if they were not unusually mouldy and wet.

The court concludes that the defendant has failed to overcome libellant's prima facie case in that it failed to show that it used reasonable care in the trenching of the nuts.

There accordingly should be a decree in favor of the libellant for the expenses it reasonably incurred in reconditioning the shipment to minimize the loss.