373 F.2d 101
 SKIBS A/S DALFONN, as Owner of the M/T DALFONN, Libellant-Appellee,
v.
S/T ALABAMA, her engines, etc., and the Texas Company
(Texaco, Inc.), Claimant-Respondent-Appellant.
TEXACO, INC., as Owner of the S/T Alabama, Cross-Libellant-Appellee,
v.
M/T DALFONN, her engines, etc., and Skibs A/S Dalfonn,
Cross-Claimant-Respondent-Appellant.
 Nos. 315, 316, Dockets 30861, 30862.
 United States Court of Appeals Second Circuit.
 Argued Jan. 20, 1967.
Decided Feb. 14, 1967.
 
 Joseph M. Brush, II, New York City (Brush & Brush, New York City, on the brief), for appellant, Texaco, Inc.
 MacDonald Deming, New York City (Haight, Gardner, Poor & Havens, and Richard G. Ashworth, New York City, on the brief), for appellee, Skibs A/S Dalfonn.
 Before MEDINA, ANDERSON and FEINBERG, Circuit Judges.
 ANDERSON, Circuit Judge:
 
 
 1
 The steam tanker Alabama, owned by the appellant Texaco, Inc., collided with the Norwegian vessel m/t Dalfonn, owned by Skibs A/S Dalfonn (Dalfonn), in the Delaware River on January 14, 1958. Damage was sustained by both vessels. Dalfonn filed a libel against Texaco in the United States District Court for the Southern District of New York and Texaco filed a cross-libel. After certain negotiations the parties stipulated on the issue of fault that the Alabama should bear 65% of the responsibility for the casualty and the Dalfonn 35%. It was agreed that damages would be apportioned accordingly, and the case was referred by the district court to a special commissioner for findings on that issue. Subsequently the parties further stipulated that the Dalfonn had been damaged in the amount of $155,000. Therefore the only issue remaining was the amount of damage suffered by the Alabama, which Texaco claimed to be $108,169.77.
 
 
 2
 Texaco made an initial payment to Dalfonn of $62,890.58, which was 65% of the stipulated damage to the Dalfonn less 35% of Texaco's claimed damage to the Alabama. Hearings were then held before the special commissioner, who concluded that Texaco was entitled to recover only $22,668.26. Both parties filed exceptions to the commissioner's report; and the district court, in confirming it, further reduced Texaco's recovery to $20,162.33. On the basis of this finding Texaco was liable to Dalfonn for an additional $30,802.60, or 35% of the amount by which its damage claim was reduced. Texaco appeals from that decision, and Dalfonn cross-appeals solely because it was required to pay the costs of the reference.
 
 
 3
 After the collision, the Alabama docked at Eagle Point, New Jersey, near Philadelphia, and was inspected by an officer of the Coast Guard. Her only apparent injuries were two holes in the bow at the 32 and 40 foot marks. The Coast Guard inspector's first act upon boarding the Alabama was to 'lift' her Certificate of Inspection, which prevented her from making further voyages until the Coast Guard was satisfied that the repairs which it decided were necessary had been made. See Rev.Stat. 4453-4454 (1875), 46 U.S.C. 435-436 (1959).[1]
 
 
 4
 The Alabama was then temporarily repaired at Eagle Point by a cement box patch on the inside of her bow, after which the Coast Guard issued a permit for the Alabama to proceed to Galveston, Texas, via Providence, Rhode Island where she was to deliver her cargo of black oil, and thence to proceed to Galveston for hull repairs with leave to carry cargo and touch at intermediate ports in her course.
 
 
 5
 The voyage from Providence to Galveston, normally one of five to seven days, took sixteen days. The Alabama left Providence on January 17, 1958 and arrived at Galveston on February 3, 1958. The reason was that, en route to Galveston, the Alabama was completely gasfreed in preparation for entry into drydock. This process consisted of washing out the tanks with hot water and carrying out the difficult and time consuming task of 'mucking,' which required lowering crew members into the tanks to take out oily deposits and debris in pails. At Galveston, the Alabama went into drydock at the Todd Shipyards where her collision damage was repaired and she was given her annual overhaul, originally scheduled for June, 1958, but moved up to February, to save certain costs by doing the repairs and the overhaul work at the same time. The vessel was in drydock for eleven days, and was returned to service twenty-seven days after she had left Providence.
 
 
 6
 The question on appeal results from the commissioner's disallowance of certain items of damage, claimed by Texaco, which, although incidental to the repairs to the Alabama made necessary by the collision, were also a necessary part of the annual overhaul performed at the same time. These expenses, common to the repairs and the annual overhaul, consisted of the costs involved in gas-freeing and drydocking and detention, an amount equal to the profits which were lost to Texaco because the Alabama was out of service for approximately twenty-seven days. See, e.g., The North Star, 151 F. 168, 175 (2 Cir. 1907).
 
 
 7
 The commissioner applied the rule of law, conceded by both parties to be correct, that if Texaco, when it decided to repair the Alabama's collision damage at once, reasonably and in good faith believed that the vessel was not fit for her normal service without permanent repairs, it was entitled to recover as damages all of the costs of repair, including those which were common both to the collision and to the annual overhaul. Conversely, if it was not reasonable for Texaco to reach such a conclusion, none of the common expenses could be charged to Dalfonn, and Texaco could recover only those costs which were attributed strictly to the repair of the bow. See Pan-American Petroleum & Transport Co. v. United States, 27 F.2d 684 (2 Cir. 1928). See also Ellerman Lines, Limited v. The President Harding, 288 F.2d 288 (2 Cir. 1961); The Pocahontas, 109 F.2d 929 (2 Cir. 1940); Clyde S.S. Co. v. City of New York, 20 F.2d 381 (2 Cir. 1927). This rationale behind the distinction is readily apparent. When the owner of an injured vessel has good reason to believe that the vessel will not be seaworthy without permanent repairs, it is entitled to make such repairs immediately at the cost of the tort-feasor, and 'it must be treated as a matter of indifference to the tortfeasor that the owner gets an incidental benefit from the detention.' Clyde S.S. Co. v. City of New York, supra at 381. But an injured party is not entitled to compensation for expenses which could have been avoided if he had taken reasonable steps to minimize damages. See Ellerman Lines, Limited v. The President Harding, supra, 288 F.2d at 289-290; Restatement, Torts 918; 2 Harper & James, Torts 25.4 (1956).
 
 
 8
 Texaco, however, has contended, both in the District Court and here, that it was necessary for it to make the permanent repairs ordered by the Coast Guard, before the vessel's Certificate of Inspection would be returned. If that were so, Texaco's course of action would be reasonable as a matter of law. The Coast Guard has authority to determine when and under what conditions a vessel is fit for service. Moreover, if the inspecting officer sought to impose a requirement of immediate repairs, Texaco would not, as Dalfonn has argued, have to appeal that ruling to a higher echelon of command in the Coast Guard as a prerequisite to making a claim for damages in the federal court. It was entitled to consider as dispositive a determination by the officer assigned to examine the vessel.
 
 
 9
 Whether the Coast Guard authorities did in fact indicate that the Alabama would not be considered fit for service until her bow damage was permanently repaired is not conclusively established in the record. While the Certificate of Inspection was 'lifted' from the Alabama, the record discloses no revocation under the terms of the statute, nor is there any finding by the Coast Guard 'that repairs have become necessary to make such vessel safe,' followed by a notification to the master 'in writing as to what is required.' There are only two Coast Guard documents in the evidence submitted to this court. One is a 'Record of Inspection Other Than Annual Inspection' which is a report by the inspecting officer to the Commandant summarizing the damage to the Alabama and saying, 'In view of temporary repairs consisting of soft patches in holed areas and the concurrence of A.B.S. The vessel was issued a permit to proceed on 1/15/58.' The other is a 'Permit to Proceed to Another Port for Repairs,'[2] issued on January 15, 1958 by the inspector's superior officer, Commander Gunn, the Officer in Charge of Marine Inspection at Philadelphia. The permit implies that, while hull repairs were required, the vessel was not unsafe; it contains no time limit nor does it order the vessel to proceed from Providence to Galveston by the most direct sea route; in fact, it allows the vessel to carry cargo (but not passengers) and to stop at intermediate ports.
 
 
 10
 The commissioner found that after completion of the temporary repairs, Texaco merely requested a permit to deliver a single cargo of fuel oil to Providence and then proceed to Galveston; that the Coast Guard granted the request because it was all that Texaco applied for and the Marine Inspector's office decided it was well within the range of what the Coast Guard considered safe; and that the Coast Guard's action was not a determination that the Alabama was unfit for further service without permanent repairs.
 
 
 11
 In cases of this kind, the question of what the Coast Guard found about the seaworthiness and safety of a vessel and what orders it made should not be left to conjecture or for determination in a subsequent judicial proceeding. In administering the provisions of Title 46 U.S.C. 435-436, the Coast Guard operates with the same authority as any other administrative agency within the area of its competence, and in order that its actions may later be determined with certainty, it should make written findings and explicit written orders so that those subject thereto will know what they must do to comply. The statute, 46 U.S.C. 435, supra, provides, '* * * if there shall be discovered * * * that repairs have become necessary to make such vessel safe, the master shall at once be notified in writing as to what is required.' It also states that when a vessel's Certificate of Inspection is revoked, '* * * the owner, master of agent of said vessel shall immediately be given notice, in writing, of such revocation.' The failure to make written findings in this case and an order relating to the 'lifting' of the certificate anc the conditions precedent to its return or reissuance were serious deficiencies, because it left open for contest an issue which should have been disposed of prior to the hearing, and it compelled the court and the commissioner to treat it as any other question of fact. Moreover, because of the inconclusive state of the testimony on the issue, the commissioner had to make inferences about what the Coast Guard did from evidence on other aspects of the case.
 
 
 12
 It may be that, as called for by the statute, a more complete finding and a more detailed and explicit order were issued. If so, no one knows where they are or what they said. Evidence on the point was meager and inconclusive. Lieutenant Commander Ewels, the inspector, testified that he had no recollection of what he discovered on his inspection and did not remember whether or not he tole Texaco's representatives that the Coast Guard would insist on permanent repairs being made at once. The testimony of his superiors, the Officer in Charge in Philadelphia, and the Marine Inspection Officer of the Third Coast Guard District, both of whom were involved in issuing the Alabama's permit, was unavailable because both had died before the commissioner's hearing and prior to the taking of depositions. Texaco's port inspector testified that Lt. Comdr. Ewels, after conferring with his superior officer by telephone, told Texaco's inspector that, aside from the voyage to Providence, the Alabama would not be permitted to carry cargo until her bow was permanently repaired. The commissioner, however, found this testimony unpersuasive. He based his finding, that a reasonable person would not have thought permanent repairs to be immediately necessary, instead, upon the results of the survey of the Alabama at Eagle Point. In his report he said 'the evidence (was) overwhelming that all of the surveyors who looked at the Alabama at Eagle Point concluded that * * * the Alabama could have continued sailing and carrying her oil cargoes * * * until June of 1958, when the date of her annual overhaul was scheduled.'
 
 
 13
 The District Court confirmed the conclusions of the commissioner except for a few items incidental to an annual overhaul which could not, consistently with the denial of detention damages, be credited to Texaco. This exception reduced the award to Texaco from $22,668.26 to $20,162.33.
 
 
 14
 It is, of course, settled in this circuit that the determination or conclusion of whether Texaco acted reasonably or unreasonably in the light of the factual circumstances found by the trier is reviewable by this court as a question of law. See, e.g., Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 776 (2 Cir. 1966); Ellerman Lines, Limited v. The President Harding, supra, 288 F.2d at 292; Romero v. Garcia & Diaz, Inc.,286 F.2d 347, 355 (2 Cir. 1961); Great Atlantic & Pacific Tea Co. v. Brasileiro, 159 F.2d 661 (2 Cir. 1947). If the Coast Guard did not require permanent repairs at once, we agree with the commissioner that it was unreasonable for Texaco to believe that the Alabama, after the completion of the temporary repairs, would not remain seaworthy until June of 1958. The issue of what the Coast Guard did requires a finding and conclusion about what actually happened, rather than a determination of whether certain proven acts or omissions conformed to a standard. On review it must therefore be treated purely as a question of fact. See Ellerman Lines, Limited v. The President Harding, supra, 288 F.2d at 292. See also mamiye Bros. v. Barber Steamship Lines, Inc., supra, 360 F.2d at 776. Consequently this court's role is limited. A commissioner's finding of fact, confirmed by the district judge, should be upheld unless clearly erroneous. Ozanic v. United States, 165 F.2d 738, 742 (2 Cir. 1948). See also In Re Petition of A C Dodge, Inc.,282 F.2d 86, 88 (2 Cir. 1960); Pioneer Import Corporation v. The Lafcomo,159 F.2d 654, 656 (2 Cir.) cert. denied Black Diamond Lines v. Pioneer Import Corp., 331 U.S. 821, 67 S.Ct. 1310, 91 L.Ed. 1838 (1947); Todd Erie Basin Dry Docks, Inc. v. The Penelopi, 148 F.2d 884, 886 (1945). This rule has particular force where, as here, the determination rests on an evaluation of oral testimony. See Wieder v. Isbrandtsen Co., Inc., 186 F.2d 496, 499 (2 Cir. 1951). Under the circumstances of this case, there was sufficient to warrant the commissioner's conclusion that the Coast Guard did not require immediate permanent repairs. Moreover, appellant is in a particularly difficult position to urge reversal, because the burden of proof on the issue in question rested on Texaco. See Pan-American Petroleum & Transport Co. v. United States, supra 27 F.2d at 686. We are satisfied that the District Court was correct in upholding the commissioner's conclusion that Texaco failed to sustain its burden of proof. A complete review of the whole record leaves us with no 'definite and firm conviction that a mistake has been committed.' See McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954); United States v. United States Gypsum Co.,333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).
 
 
 15
 Dalfonn cross-appeals from that portion of the district court's order taxing the costs of the reference against it on the ground that it should not, as the prevailing party, be required to pay costs. Under the admiralty rule governing this case, taxation of costs[3] is within the sound discretion of the trial judge. See Petition of Skibs A/S Jolund, 302 F.2d 114 (2 Cir. 1962); Higgins, incorporated v. Hale, 251 F.2d 91 (5 Cir. 1958); Munson v. Straits of Dover S.S. Co., 102 F. 926 (2 Cir. 1900). The trial judge, accepting the recommendation of the special commissioner, properly exercised that discretion. Thus, while costs of $3,206.84 were taxed to Dalfonn, interest of 6% from the date of the stipulation, also a discretionary matter, Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426 (2 Cir. 1962), was granted to Dalfonn. The district judge fairly apportioned the expenses between the parties.
 
 
 16
 The judgments below are affirmed.
 
 
 
 [1]
 435 provides, in pertinent part, as follows:
 'In addition to the annual or biennial inspection, the head of the department in which the Coast Guard is operating shall require the Coast Guard to examine, at proper times, inspected vessels arriving and departing to and from their respective ports, so often as to enable them to detect any neglect to comply with the requirements of law, and also any defects or imperfections becoming apparent after the inspection aforesaid, and tending to render the navigation of such vessels unsafe; and if there shall be discovered any omission to comply with the law, or that repairs have become necessary to make such vessel safe, the master shall at once be notified in writing as to what is required. All inspections and orders for repair shall be made promptly. When it can be done safely, repairs may be permitted to be made where those interested can most conveniently do them. And whenever it is ascertained that any vessel subject to the provisions of this title or Acts amendatory or supplementary thereto * * * for any * * * reason * * * cannot be operated with safety to life, the owner or master of said vessel shall be ordered to correct such unlawful conditions, and the vessel may be required to cease navigating at once and to submit to reinspection; and in case the said orders shall not at once be complied with, the vessel's certificate of inspection shall be revoked, and the owner, master, or agent of said vessel shall immediately be given notice, in writing, of such revocation; and no new certificate of inspection shall be again issued to her until the provisions of this title or Acts amendatory or supplementary thereto have been complied with. * * *'
 Another portion of 435 provides for the libelling of a vessel operating without a certificate of inspection. 436 subjects to penalties the master or owner of a vessel not complying with the orders of a Coast Guard inspector, made in pursuance of 435.
 
 
 [2]
 'The S.S. Alabama of Wilmington, in the State of Delaware O.N. 246968, whereof Theodore Kuller is Master, has been examined and inspected this date and I find that the said vessel is requiring repairs, to wit:
 HULL REPAIRS
 The said Master requesting that the said vessel be permitted to proceed to the port of Galveston, Texas via Providence, R. I. for the purpose of making the said repairs, I do hereby, after due consideration, regarding it as safe to do so, permit her to proceed to said port with cargo and without passengers, touching at intermediate ports in her course, as if she had, in every particular, complied with the requirements of law.'
 
 
 [3]
 This case was decided in the district court prior to July 1, 1966. It is thus not covered by the Supreme Court's order of February 28, 1966 making the Federal Rules of Civil Procedure applicable in admiralty cases. See 383 U.S. 1029 (1966). As a result, this case is not governed by the civil rule 54(d) under which the prevailing party is normally entitled to costs