INTERSTATE STEEL CORPORATION,
Libelant,

v.

S.S. "CRYSTAL GEM", her engines, boilers, etc., Sugar Line Ltd., Federal Commerce & Navigation Co., Ltd., Pittston Stevedoring Corporation, Respondents.

No. 64 AD. 461.

United States District Court,
S.D. New York.

Feb. 25, 1970.

As Amended April 16, 1970.

**114**

Hill, Rivkins, Warburton, McGowan & Carey New York City, for plaintiff, Alan S. Loesberg, Vincent J. Ryan, New York City, of counsel.

Healy & Baillie, New York City, for Federal Commerce & Nav. Co., Ltd., Allan A. Baillie, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for Pittston Stevedoring Corp., John L. Quinlan, William P. Kardaras, New York City, of counsel.

Kirlin, Campbell & Keating, Richard H. Sommer, Richard E. Repetto, New York City, for Sugar Line, Ltd.

## OPINION

TENNEY, District Judge.

This suit in admiralty commenced by Interstate Steel Corporation (hereinafter referred to as "Interstate") seeks to recover for damage allegedly sustained to a shipment of 581 coils of hot rolled steel while on board and during discharge

from the S.S. CRYSTAL GEM, a vessel owned by defendant Sugar Line Ltd. (hereinafter referred to as the "shipowner"). Trial began on October 22, 1969 and concluded the following day. Post trial memoranda were thereafter submitted by all parties, and at the Court's request proposed findings of fact and conclusions of law were prepared by plaintiff Interstate and defendant Pittston Stevedoring Corporation (hereinafter referred to as the "stevedore"), the discharging stevedore. Having heard testimony, examined the record and exhibits and carefully considered counsels' supporting briefs and applicable authority, the Court makes the following determinations.

*Findings of Fact*

1. At all times pertinent hereto, the S.S. CRYSTAL GEM was owned by defendant shipowner.

2. Defendant Federal Commerce & Navigation Co., Ltd. (hereinafter referred to as the "charterer") entered into a time charter of the British flag vessel S.S. CRYSTAL GEM with shipowner, dated April 11, 1963 on the standard Government form, as approved by the New York Produce Exchange.

3. Defendants charterer and shipowner have filed a true copy of this time charter with the Court, and have stipulated that this contract was in existence and governed the relationship between these defendants on the voyage of the S.S. CRYSTAL GEM in September and October 1963.[1]

4. By Clause 8 of the time charter, it was provided that: "The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, discharge and trim the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lad-

ing for cargo as presented, in conformity with Mate's or Tally Clerk's receipts."

6. Clause 24 of the charter provided that it was subject to the "U.S.A. Clause Paramount" which was to be included in all bills of lading issued thereunder.

7. On August 15, 1963, defendant charterer, as time chartered owner, and The Jordan International Co. (hereinafter referred to as "Jordan") as subcharterer, entered into a charter party to which the bill of lading involved herein refers.[2] Clause 33 of this charter party provided that the "U.S.A. Clause Paramount" was to be considered a part of this charter party as though fully incorporated therein.

8. During the term of the charter party with shipowner, defendant charterer directed the vessel to the port of Tampico, Mexico, where it loaded 581 hot rolled steel coils which had been purchased by plaintiff Interstate from the Eastern Steel & Metal Co. of New Haven, Connecticut,[3] pursuant to an irrevocable letter of credit dated July 2, 1963.[4] The steel had been produced by Altos Hornos de Mexico, S.A., at its mills in Montclova, Mexico.

9. On September 25, 1963, defendant charterer issued a "clean on board" negotiable bill of lading at Tampico, Mexico, indicating that the cargo of 581 hot rolled steel coils were shipped "in apparent good order and condition". The bill of lading was signed by charterer's agents, Representaciones Maritimas, S. A. but not by the Master of the vessel.[5]

10. The cargo of steel coils was consigned to plaintiff Interstate for carriage to Chicago, Illinois.[6]

11. In consideration of charterer omitting to clause the bill of lading as follows:

"All cargo loaded from open quai and all coils showing signs of rust in various stages"

1. Defendant shipowner's Exh. A.
2. Plaintiff's Exh. 1.
3. Plaintiff's Exh. 7.
4. Plaintiff's Exhs. 8 and 9.
5. Plaintiff's Exh. 1.
6. *Id.*

Jordan agreed to hold charterer harmless from any and all consequences that might arise from the bill of lading not having been claused as indicated.[7]

12. The steel coils were stowed in the Nos. 2, 3 and 4 holds of the S.S. CRYSTAL GEM.

13. Plaintiff did not inspect the coils prior to the arrival of the vessel at the port of Chicago on October 25, 1963.

14. Prior to the discharge of the cargo by defendant stevedore, which had been employed by defendant charterer to unload the coils, an initial inspection of the cargo in the No. 2, 3 and 4 holds was made by William J. Coakley, a marine surveyor who represented both plaintiff and its cargo insurer, The Hartford Fire Insurance Company of New York,[8] and George E. Fanning, a marine surveyor representing the interests of the defendant charterer.

15. The steel coils were bound by two 2-inch-wide bands around the circumference and four bands of about an inch and a quarter in width through the eye and around the coil at 90-degree intervals. In addition, the outer laps at the end of the coils were tack-welded to the next inside lap to protect the edges of the steel from the strapping.[9] These bindings provided adequate packaging for the ocean voyage involved herein.[10]

16. The coils showed no evidence of shifting in stowage.[11] There was evidence, however, of some broken bands and small amounts of telescoping and edge crimping which apparently occurred either prior to or during loading of the cargo at Tampico, Mexico.[12]

17. Additionally, rust in varying degrees was noted on the coils in the No. 2, 3 and 4 holds,[13] with excessive rust conditions observed on 42 coils located beneath the hatch coaming of the No. 3 hold.[14]

18. Samples of steel strapping and paper wrapping material from the excessively rusted coils were submitted by Mr. Coakley to the Factory Standards Laboratory Inc. of Chicago, Illinois, for chemical analysis.[15] The Chloride Anion Test performed on these samples revealed a heavy concentration of chloride or salt water present.[16]

19. A subsequent inspection revealed that the surface of 34 of these coils had been pitted by seawater, a result not attributable to light atmospheric rust.[17] This damage was caused by water entering the hatch covers of the No. 3 hold as evidenced by rust streaks on the inner coaming directly above the excessively rusted coils.[18]

20. With respect to the claim for rust damage, plaintiff seeks recovery only for those coils damaged by seawater rust.[19]

21. Discharge by defendant stevedore of the 581 coils of hot rolled steel commenced on October 26, 1963 and was completed on the morning of the following day.

22. Both Mr. Coakley and Mr. Fanning witnessed the cargo being discharged.[20]

23. Stevedore used bare wire slings without the use of spreader bars or other protection to discharge the cargo. An overhead crane rapidly lowered the steel to the dock, which resulted in the coils striking each other and the ground upon impact.[21]

---

7. Plaintiff's Exh. 3.

8. Defendant stevedore's Exh. A.

9. Tr. 17–18; 67–68.

10. Tr. 18; 68, 117.

11. Tr. 69; 159.

12. Tr. 69; 159–60.

13. Tr. 162–63.

14. Tr. 69; 157, 162–66.

15. Tr. 69–70; Plaintiff's Exh. 4 at 3–10.

16. Plaintiff's Exh. 5; Plaintiff's Exh. 4 at 7–10.

17. Tr. 70, 83–84.

18. Tr. 87; 157, 168.

19. Tr. 84; Plaintiff's Exh. 12 at 5.

20. Tr. 70–71; 158.

21. Tr. 70–71; 158, 167–68.

24. Both Mr. Coakley and Mr. Fanning complained about the improper methods used in discharging the cargo to Mr. Metcalf, defendant Pittston's chief stevedore.[22] No corrective action was taken with respect to these complaints, and stevedore continued its negligent discharge of the cargo, which resulted in considerable damage to the coils,[23] consisting of deep edge cutting, denting to coil sheets, broken bands and telescoping.

25. Approximately 10 per cent of the total damage sustained by the coils, excluding heavy rusting, occurred prior to discharge.[24]

26. On October 27, 1969, the Master of the S.S. CRYSTAL GEM objected to the manner in which the coils were being discharged, and notified defendant stevedore in writing of the damage caused by such improper methods.[25]

27. A joint survey with respect to the ascertainment of damages was held at numerous times in November and December of 1963.[26] In attendance were: Mr. Coakley, representing the cargo insurers; Mr. Fanning, representing defendant charterer; Captain F. B. Hunt, representing defendant stevedore; George E. Leithner, representing defendant shipowner; and R. P. Evans, representing plaintiff Interstate.[27]

28. It was jointly agreed among all the surveyors that 25 per cent of the coils were to be examined and inspected in detail in order to ascertain the damage sustained by all the coils,[28] and that this percentage would be applied to the total number of coils.[29]

29. A tally, based on this agreement, appears in Mr. Coakley's survey report.[30]

30. Telescoping damage of three inches or less was not considered by the surveyors since the machinery at the particular plant processing the coils could handle a coil telescoped up to three inches.[31] In addition, items in plaintiff's claim considered in the category of mill defects, such as edge lamination, were not considered.[32]

31. The following was determined by the surveyors with respect to damages:

(a) The equivalent of 1,006.55 tons of coil had to be edge trimmed at a cost of $9.00 per ton;[33]

(b) 342.66 tons of ballooned coil had to be recoiled at a cost of $6.00 per ton;[34]

(c) 257 tons required extra handling because of their damaged shape at a cost of $7.00 per ton;[35]

(d) 163 tons which could not be used for sheeting had to be reallocated at a cost of $2.00 per ton;[36]

(e) 100 tons of scrap was generated by the damage at a value of $17.00 per ton;[37]

(f) 34 coils found to be damaged by seawater had to be reconditioned at a cost of $17.00 per ton.[38]

32. The method used by the surveyors was a customary method of ascertaining damages in the maritime industry and was, in fact, the best method used in this case to minimize the damages. A public or private sale would have resulted in a greater loss and the election to examine all the coils in detail

22. Tr. 75–76; 158.

23. Plaintiff's Exh. 13; Tr. 44–46; 72–76.

24. Plaintiff's Exh. 12 at 3; Tr. 159.

25. Plaintiff's Exh. 11; Tr. 77; Defendant stevedore's Exh. D.

26. Tr. 76, 79; 168.

27. Tr. 78–79; Plaintiff's Exh. 12 at 2.

28. Tr. 79.

29. Plaintiff's Exh. 12 at 3.

30. Plaintiff's Exh. 12; Tr. 79.

31. Plaintiff's Exh. 12 at 6; Tr. 80.

32. Plaintiff's Exh. 12 at 7; Tr. 82.

33. Tr. 82; Plaintiff's Exh. 12 at 6.

34. *Id.*

35. Tr. 83; Plaintiff's Exh. 12 at 6.

36. *Id.*

37. *Id.* The value of sound secondary steel in Chicago for the time involved herein was between $73.00 and $78.00 per ton. Tr. 17.

38. Tr. 83–84; Plaintiff's Exh. 12 at 6.

would have been costly and might well have resulted in additional damages.[39] The expenses listed above with respect to edge trimming, recoiling, extra-handling, reallocation, scrap value and pickling were fair and reasonable.[40]

33. Predicated upon these findings, plaintiff is entitled to the following damages:

(a) Edge Trim. 1006.55 tons at $9.00 per ton ... $9,058.95

(b) Recoiling. 342.66 tons at $6.00 per ton .... $2,055.96

(c) Extra-handling. 257 tons at $7.00 per ton ...... $1,799.00

(d) Reallocation. 163 tons at $2.00 per ton ...... $ 326.00

(e) 100 tons at a sound market value of $75.00 per ton generated as 89.27 gross tons of scrap at $17.00 per ton resulted in the following loss .......... $5,982.41

(f) Saltwater rust pickling.
170 tons at $14.00 per ton ..... $2,380.00

Total Damages .... $21,602.32

---

### Discussion

■ It appears abundantly clear and unnecessary of extended discussion that the Carriage of Goods by Sea Act of 1936, 46 U.S.C. §§ 1300–15 (hereinafter referred to as "COGSA"), is applicable to the shipment involved in this action both *ex proprio vigore* and as incorporated under the terms and conditions of the charter party referred to in the bill of lading dated August 15, 1963. 46 U.S.C. § 1305; United States v. Wessel, Duval & Co., 115 F.Supp. 678, 682–683 (S.D. N.Y.1953). As such, the carrier, which is defined in Section 1301(a) of COGSA as "the owner or the charterer who enters into a contract of carriage with a shipper" is bound, before and at the beginning of the voyage, to exercise due diligence to make the ship seaworthy, make all parts of the ship in which goods are carried fit and safe for their reception, carriage and preservation, and to properly and carefully load, handle, stow and discharge the goods carried. 46 U.S. C. § 1303(1) (2). Plaintiff's *prima facie* case is established by proof merely of receipt of the cargo by the carrier in good order and delivery at destination damaged. Daido Line v. Thomas P. Gon-zalez Corp., 299 F.2d 669, 671 (9th Cir. 962). This showing of good condition at time of shipment sufficient for plaintiff's *prima facie* case is satisfied by the introduction into evidence of a clean on board bill of lading. 46 U.S.C. § 1303 (4); Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp., 316 F.2d 163, 172–173 (5th Cir. 1963); American Tobacco Co. v. The Katingo Hadjipatera, 194 F.2d 449, 452 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952). The burden of proving that such damage was not due to its negligence or was occasioned by one of the "excepted causes" enumerated in Section 1304(2) of COGSA is then cast upon the carrier. Daido Line v. Thomas P. Gonzalez Corp., *supra*; American Tobacco Co. v. The Katingo Hadjipatera, *supra*; The Guanancita, 69 F.Supp. 928, 930 (S.D.Fla.1947); Mente & Co. v. Isthmian S.S. Co., 36 F. Supp. 278 (S.D.N.Y.1940), aff'd, Quarrington Court, 122 F.2d 266 (2d Cir. 1941). This follows from the fact that the discharge of the carrier's "extraordinary duty" as a bailee is under its exclusive control. The facts and circumstances which may serve to relieve it

40. Tr. 168; Defendant Charterer's Exh. A. 39. Tr. 81–82.

from liability when cargo for which a clean bill of lading has been issued is outturned damaged, are peculiarly within the carrier's knowledge and unknown to the shipper. In consequence, the law imposes upon the carrier "the burden of the loss which he cannot explain or, explaining, bring within the exceptional case in which he is relieved from liability." Schnell v. The Vallescura, 293 U.S. 296, 304, 55 S.Ct. 194, 196, 79 L.Ed. 373 (1934); Konfort, S.A. v. The S.S. Santo Cerro, 190 F.Supp. 1, 7 (S.D.N.Y.1960).

■ Defendant charterer and shipowner by failing to call a single witness with regard to proving that they exercised due diligence to make the S.S. CRYSTAL GEM seaworthy by providing hatch covers which were watertight, and that they properly and carefully loaded, stowed and discharged the cargo in question are liable to plaintiff for the damage sustained since they have not rebutted plaintiff's *prima facie* case that the coils were in good order and condition at the time of shipment by convincing proof to the contrary. Kupfermann v. United States, 227 F.2d 348, 349–350 (2d Cir. 1955).

■■ Furthermore, defendant stevedore owed the same duty of care under COGSA as the carrier, that is, to properly and carefully handle the discharge of the cargo. Having concluded that stevedore improperly discharged the coils which resulted in 90 per cent of the total damage sustained, excluding heavy rusting, its *prima facie* liability for such damage to plaintiff is established. St. Paul Fire & Marine Ins. Co. v. Vessel Trinity, 1967 A.M.C. 1768 (C.D.Cal. 1967); see Luigi Serra, Inc. v. S.S. Francesco C, 1965 A.M.C. 2029 (S.D.N.Y. 1965), aff'd, 379 F.2d 540 (2d Cir. 1967); Shamrock Towing Co. v. Schiavone-Bonomo Corp., 173 F.Supp. 39 (S. D.N.Y.1959), aff'd, 275 F.2d 338 (2d Cir. 1960). Similarly, plaintiff's *prima facie* case has not been rebutted by this defendant with proof sufficient to show by a preponderance of the evidence that the damage occurred without a breach of stevedore's duty to properly and carefully handle and discharge the coils.

We thus turn to a consideration of possible primary and secondary liability in order to determine whether there exists a basis for a finding of indemnification as among defendants.

■ "Unlike contribution, indemnity is the shifting of the entire loss to another who ought to bear it because (a) he expressly or impliedly agreed to do so, or (b) his fault is 'primary' and relatively more grievous, and the other fault is 'passive' or 'constructive', or 'vicarious' or 'insulated'." Wallenius Bremen G.m. b.H. v. United States, 409 F.2d 994, 998 (4th Cir. 1969). Under the terms of the bill of lading and COGSA, it was carrier's duty to properly and carefully load, handle, stow and discharge the cargo. Defendant stevedore, whether termed agent or independent contractor, was engaged by charterer to discharge the coils, Konfort, S.A. v. The S.S. Santo Cerro, *supra*, 190 F.Supp. at 5–6, and therefore its negligence is chargeable against the charterer, *in personam*, and secondarily against the vessel, *in rem*. Plaintiff's right to a lien against the ship for damage caused during discharge is based upon an implied hypothecation to secure performance of the contract of affreightment once the cargo is aboard. Pioneer Import Corp. v. The Lafcomo, 138 F.2d 907, 908 (2d Cir. 1943), cert. denied, Black Diamond Lines, Inc. v. Pioneer Import Corp., 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063 (1944); Blanchard Lumber Co. v. S.S. Anthony II, 259 F.Supp. 857 (S.D.N.Y.1966); American Tobacco Co. v. The Katingo Hadjipatera, 81 F.Supp. 438, 444–445 (S.D.N.Y.1948), modified, 194 F.2d 449 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952); The C. W. Crane, 64 F. Supp. 627 (E.D.N.Y.1945), aff'd, 155 F.2d 940 (2d Cir. 1946). Of course, should it be necessary for plaintiff to execute upon the maritime lien, shipowner would be entitled to a decree for damages against charterer, which employed the primary tortfeasor. In turn, if charterer, which as between shipowner and itself

is primarily liable, is called upon to bear the cost of damages incurred during discharge, then it, too, would be entitled to reimbursement from stevedore for any sum which it is required to pay in satisfaction of plaintiff's claim. Shamrock Towing Co. v. Schiavone-Bonomo Corp., *supra*; American Tobacco Co. v. The Katingo Hadjipatera, *supra*, 81 F.Supp. at 448; see Luigi Serra, Inc. v. S.S. Francesco C, *supra*; Newport News Shipbuilding & Drydock Co. v. United States, 226 F.2d 137, 143 (4th Cir. 1955); United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833, 840 (S.D.N.Y.1965); Hershey Chocolate Corp. v. The S.S. Robert Luckenbach, 184 F.Supp. 134, 140 (D.Ore.1960), aff'd, Albina Engine & Machine Works, Inc. v. Hersey Chocolate Corporation, 295 F.2d 619 (9th Cir. 1961).

With regard to that portion of the damage sustained prior to discharge, excluding heavy rusting, I find charterer primarily liable and the vessel secondarily liable *in rem*. Here, again, should shipowner be called upon to respond to plaintiff for this portion of the damage it would be entitled to indemnification from charterer.

■ There exists an implied personal warranty to the charterer by the shipowner of the seaworthiness of the vessel when delivered for the intended voyage. Petition of Reliance Marine Transp. & Const. Corp., 206 F.2d 240, 243 (2d Cir. 1953); Miller v. Union Barge Line Corp., 299 F.Supp. 718 (W.D. Pa.1969). This warranty is non-delegable, The Louise, 54 F.Supp. 157, 161 (D. Md.1943), and shipowner has the burden of proving that the ship was seaworthy at that time. A finding of excessive rust on cargo resulting from the seepage of seawater through the hatch covers of the No. 3 hold would justify the presumption of the unseaworthiness of the S.S. CRYSTAL GEM, which, remaining unrebutted, would entitle plaintiff to a decree against shipowner and charterer for such damage. Further, a finding that this condition existed when the vessel was delivered to charterer by owner would entitle charterer to a decree over against shipowner for whatever it may have to pay plaintiff for the loss occasioned by the unseaworthy condition. Connecticut Adamant Plaster Co. v. James McWilliams Blue Line, Inc., 149 F.Supp. 122, 126 (S.D.N.Y.1957), aff'd, 253 F.2d 785 (2d Cir. 1958). Here, however, the clean bill of lading issued by the charterer's agent acknowledging receipt of the cargo "in apparent good order and condition", although not conclusive, did amount to initial proof of the cargo's freedom from open and visible damage prior to shipment. Stirnimann v. The San Diego, 148 F.2d 141, 142 (2d Cir. 1945). And, as previously noted, the clean bill of lading was issued in consideration for Jordan's promise to hold charterer harmless from all consequences that might arise by its failure to note on the bill of lading that the cargo had been loaded from an open quai and that all the coils showed signs of rust in various stages. The effect of this omission was to establish, at least with respect to the type of cargo involved herein, cf. The Niel Maersk, 91 F.2d 932, 933 (2d Cir.), cert. denied, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937), *prima facie* proof of the apparent good order and condition of the cargo and to relieve plaintiff of the burden of showing, assuming that the damage had been increased by defendants' improper loading, stowage, handling or discharge of the cargo, what the condition of the coils was when placed on board. Schnell v. The Vallescura, *supra*, 293 U.S. at 304–305, 55 S.Ct. 194, 79 L.Ed. 373; The Niel Maersk, *supra*, 91 F.2d at 934; Sanib Corp. v. United Fruit Co., 74 F.Supp. 64 (S.D.N.Y.1947). Additionally, charterer's issuance of the clean bill of lading, which was not signed by the shipowner's Master, may have estopped defendants from attempting to prove the actual condition of the cargo when delivered. See Oliver Straw Goods Corp. v. Osaka Shosen Kaisha, 47 F.2d 878 (2d Cir.), cert. denied, 283 U.S. 856, 51 S.Ct. 648, 75 L.Ed. 1462 (1931); Standard Brands, Inc. v. The Radja, 114 F.Supp. 456, 458 (N.D.Cal.1953).

Under these circumstances, it would be inequitable to impose primary liability on shipowner, and so I find charterer primarily liable for the damage sustained by excessive rusting, with shipowner entitled to a decree over against charterer should it be required to answer for such damage.

 With respect to the issues of the award and computation of damages, Section 1304(5) of COGSA provides that "[i]n no event shall the carrier be liable for more than the amount of damage actually sustained." This, however, has been construed as not altering the long-established and · ordinary rule that damages for injury to cargo while in the possession of a carrier are to be computed at the difference between the fair market value of the cargo at destination in the condition in which it would have arrived but for the carrier's fault and its market value in the condition in which by reason of such fault it did arrive. Elia Salzman Tobacco Co. v. The SS Mormacwind, 371 F.2d 537 (2d Cir. 1967); Weirton Steel Co. v. Isbrandtsen-Moller Co., 126 F.2d 593, 594 (2d Cir. 1942); Holden v. S/S Kendall Fish, 262 F.Supp. 862 (E.D.La.1966), aff'd, 395 F.2d 910 (5th Cir. 1968). The primary object in awarding damages is to indemnify plaintiff for the, loss sustained by reason of the carrier's fault, and with respect to this issue plaintiff bears the burden of proof. O'Brien Bros., Inc. v. The Helen B. Moran, 160 F.2d 502, 504–505 (2d Cir. 1947); Weirton Steel Co. v. Isbrandtsen-Moller Co., *supra*.

 Although the difference between the sound market value of the cargo and its damaged value at destination is the ordinary rule for assessing damages, it is by no means the sole criterion, and numerous cases have awarded the reasonable and necessary costs for repairing or reconditioning the damaged cargo where such costs were less than the diminution in market value sustained and did not exceed the value of the cargo prior to injury. Royston Distrib., Inc. v. Moore-McCormack Lines, Inc., 252 F.Supp. 480, 484–486 (E.D.Pa.1965);

Standard Brands, Inc. v. The Radja, *supra*, 114 F.Supp. at 458; The Rio Novo, 62 F.Supp. 32, 33 (S.D.N.Y.1945).; see Richard Constr. Co. v. Monongahela & Ohio Dredging Co., 407 F.2d 1170 (3rd Cir. 1969); O'Brien Bros., Inc. v. The Helen B. Moran, *supra*, 160 F.2d at 504–505. In determining the extent of such reconditioning necessary and placing liability upon the appropriate tortfeasor, courts have often accepted both the testimony of experts and their findings as embodied in marine surveys. St. Paul Fire & Marine Ins. Co. v. Vessel Trinity, *supra*; Konfort, S.A. v. The S.S. Santo Cerro, *supra*, 190 F.Supp. at 5–6; Empress Central Mercantil De Representacoes, Ltd. v. Republic of United States of Brazil, 147 F.Supp. 778, 780 (S.D.N.Y. 1957), aff'd, 257 F.2d 747 (2d Cir. 1958); Standard Brands, Inc. v. The Radja, *supra*, 114 F.Supp. at 458. This is true though the actual cost of such repairs has not been proven or where such repairs had not in fact been made. Richard Constr. Co. v. Monongahela & Ohio Dredging Co., *supra*; Tug Edmond J. Moran, Inc. v. Tank Vessel Harold Reinauer, 1957 A.M.C. 166, 170 (S.D. N.Y.1956). Indeed, costs of repairs may be estimated by an examination of only part of the damaged cargo and projections made from such representative samplings. Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp., 316 F.2d 163, 170 (5th Cir. 1963); Ataka California, Ltd. v. Ocean Cargo Lines, Ltd., 1967 A.M.C. 1576 (C.D.Cal.1967); Royston Distrib., Inc. v. Moore-McCormack Lines, Inc., *supra*, 252 F.Supp. at 487.

### Conclusions of Law

1. The Court has jurisdiction over the parties and subject matter of this controversy.

2. The Carriage of Goods By Sea Act, 1936, 46 U.S.C. § 1300 et seq., governs the loading, stowage, transport and discharge of the steel coils involved in this action.

3. The shipowner and charterer are bound to exercise due diligence to make

the vessel seaworthy, make all parts of the ship in which the coils were carried fit and safe for their reception, carriage and preservation, and to properly and carefully load, handle, stow and discharge the goods carried.

4. The issuance of a clean on board bill of lading for the receipt of the cargo and the failure to deliver the cargo to the consignee in the same good order and condition as when received for ocean carriage, establishes a *prima facie* case against the defendants, charterer and shipowner.

5. The burden to explain the loss or bring it within an "excepted cause" under the Carriage of Goods By Sea Act, 1936, is upon defendants.

6. Although, under the provisions of the Carriage of Goods By Sea Act, 1936, shipowner and charterer had the duty to discharge the cargo, as well as to load and stow it, defendant stevedore is also responsible for the damage caused by its employees at discharge at the port of Chicago. This liability is based both on negligence and breach of warranty to perform its duties in a proper and workmanlike manner.

7. The presence of saltwater gives rise to a presumption of unseaworthiness and negligence, which defendants must rebut, and, if such damage is unexplained, it must be presumed that it was caused by the negligence of the defendants in failing to exercise due diligence to make the vessel seaworthy at the commencement of the voyage.

8. Defendants must adduce clear proof that the damage claimed done by seawater did not result from failure to make the vessel seaworthy or that it did result from an "excepted cause" under 46 U.S.C. § 1304(2).

9. Defendant charterer is primarily liable for the costs of saltwater rust pickling and for 10 per cent of the remaining total damage sustained.

10. Defendant stevedore is primarily liable for 90 per cent of the damage sustained, excluding costs of saltwater rust pickling.

Accordingly, plaintiff is entitled to a decree holding defendant stevedore primarily liable and defendant charterer secondarily liable for 90 per cent of the total damage sustained, excluding heavy rusting, or $17,300.09; and holding defendant charterer primarily liable and defendant shipowner secondarily liable *in rem* for 10 per cent of the total damage sustained, excluding heavy rusting, and for 100 per cent of the damage sustained by reason of such heavy rusting, or $4,302.23.

It remains to be determined whether plaintiff is entitled to pre-judgment interest computed from October 25, 1963, the date of arrival of the damaged subject cargo in Chicago, to the date of entry of final judgment, and whether plaintiff is entitled to recover the costs of the action. Defendant Pittston, joined by defendant Federal Commerce & Navigation Co., Ltd., opposes allowance of both interest and costs.

■ It is well settled that "allowance or disallowance of interest is a matter within the discretion of the admiralty court." O'Donnell Transp. Co. v. City of New York, 215 F.2d 92, 95 (2d Cir. 1954); accord, The Scotland, 118 U.S. 507, 518–519, 6 S.Ct. 1174, 30 L.Ed. 153 (1886).

However, it is also true that "allowance of interest is the general rule and * * * disallowance is supportable only in the face of 'exceptional circumstances'." O'Donnell Transp. Co. v. City of New York, *supra*, 215 F.2d at 95; accord, Van Nievelt, Goudriaan Co.'s Stoomvart Maatschappij, N.V. v. Cargo & Tankship Management Corp., 421 F.2d 1183 (2d Cir. 1970); see The Wright, 109 F.2d 699, 702 (2d Cir. 1940). This is, of course consistent with the general purpose of awarding damages, which is to attempt to make the injured party "whole". Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 430 (2d Cir. 1962); O'Donnell Transp. Co. v. City of New York, *supra*, 215 F.2d at 95; see The President Madison, 91 F.2d 835, 845 (9th Cir. 1937).

In *O'Donnell, supra*, 215 F.2d at 95, interest was disallowed because the libelant unexplainedly delayed commencement of the suit for two years after the injury was sustained, and because the barges which were damaged were not repaired but, instead, were continued in operation. Judge (now Justice) Harlan reasoned that "[u]nder such circumstances, we cannot say that interest was so necessary to make the libellant whole. * * *"

Similar "exceptional circumstances" are conspicuously absent from the instant suit. The libel herein was filed approximately six months after the damage was discovered, and defendant Pittston was informed of such filing and of the claim against it approximately eight months after the claim arose.[41]

It is urged that interest should be withheld because of plaintiff's delay in prosecution of the action. However, in view of the following circumstances such allegation appears to be nothing more than an empty accusation. It is undisputed that after plaintiff offered to settle its claim for an amount substantially less than that awarded by this Court, defendant Pittston replied by insisting that it would not "offer a penny." Such conduct appears even more unreasonable in light of the fact that it is also undisputed that the other defendants were prepared to make substantial contributions to the settlement. Of course, defendant Pittston was entitled to decline even the most advantageous offer of settlement and await its day in court to litigate the dispute. That is, Pittston may not be placed in judgment for refusing an offer of settlement however reasonable, but the Court may take notice of the fact that its refusal to contribute any amount in settlement made resolution of the dispute virtually impossible.

Further, it appears from plaintiff's affidavit and memorandum in answer to Pittston's application to deny plaintiff pre-judgment interest and costs, that plaintiff, rather than delaying prosecution of the action, acted quite reasonably by initially attempting to effect an amicable disposition of the dispute and thereby avoid the not insignificant costs and expenses involved in a lawsuit.

 In view of Pittston's obstinate attitude with regard to settlement of this action, plaintiff's reasonable attempts to negotiate a settlement, and the fact that a libel was filed, and a notice of claim was given to defendant within eight months after discovery of the damage, it cannot be said that plaintiff was guilty of unreasonable or extravagant delay in pressing the libel so as to preclude it from receiving an award of pre-judgment interest. The Wright, *supra*, and Bushey v. Huron Stevedoring Co., 56 F.2d 604 (2d Cir. 1932), do not suggest a holding to the contrary.

 Defendant Pittston further contends that because plaintiff's claim was "exaggerated" it may not recover interest. This contention is also without merit since the Court of Appeals for this Circuit has recently held in Schroeder v. Tug Montauk, 358 F.2d 485, 488 (2d Cir. 1966) that exaggeration of damages does not preclude the trial court from awarding pre-judgment interest. In any event, I do not find plaintiff's claims to have been exaggerated since as early as June 25, 1964 plaintiff submitted a claim to Pittston for $24,722.26, which was less than 10 per cent in excess of the damages awarded by this Court,[42] and since as late as 1968 plaintiff offered to settle its claim for $15,000, which is approximately 68 per cent of the damages actually awarded.

The Supreme Court, by order dated February 28, 1966, made the Federal Rules of Civil Procedure applicable to actions in admiralty, 383 U.S. 1029–1032 (1967). Since Rule 54(d) thereunder provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs; * * *", I find plaintiff entitled to recover the

---

41. Plaintiff's Exh. A, attached to Affid. of Alan S. Loesberg (dated Mar. 18, 1970).

42. *Id.*

**124**

costs of this action. See Skibs A/S Dalfonn v. S/T Alabama, 373 F.2d 101, 107 n. 3 (2d Cir. 1967).

Accordingly, and for the foregoing reasons, plaintiff is entitled to recover pre-judgment interest to be computed from October 25, 1963 at 6 per cent per annum, as well as the costs of this action; and defendants' application is in all respects denied.

Submit order in accordance with the above order and the prior opinion dated and entered February 25, 1970.