## THE POCAHONTAS.

### EAGLE TRANSPORT CO., Limited, et al. v. UNITED STATES.

District Court, S. D. New York.
June 12, 1933.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Robert S. Erskine and A. V. Cherbonnier, both of New York City, of counsel), for libelants.

George Z. Medalie, U. S. Atty., of New York City (William E. Collins and Charles E. Wythe, both of New York City, of counsel), for the United States.

FRANK J. COLEMAN, District Judge.

The collision occurred on December 14, 1917, at about 2:50 a. m. in New York harbor between Staten Island and Norton's Point, while both steamers were at anchor. An 88 mile an hour gale was blowing at the time, and the question presented is whether the Pocahontas, dragging her anchor, drifted onto the San Tirso, or whether the latter, with her engines working in an effort to offset dragging, ran into the Pocahontas. The courts have already considered this storm and have held that the warnings had been such as to require all vessels to be secure before it broke [Clyde Steamship Co. v. United States (C. C. A.) 27 F.(2d) 727; The British Isles and Brigdo (C. C. A.) 264 F. 318]; so it is undisputed that any movement of either vessel which may have caused the collision was negligent, and the only question is which one of the two so moved.

Fifteen years elapsed between the occurrence and the trial, due to the necessity for congressional legislation to permit the litigation; and the result is that the testimony of all the eyewitnesses is deprived of much of its probative force. Contemporaneous records and statements and considerations of general probability seem to me of more importance than contradictory testimony as to specific facts after so long an interval. The question of which vessel moved into collision has three aspects: First and most important, Which vessel was to windward when the storm broke? Second, Is there convincing testimony of eyewitnesses that the Pocahontas did not drag her anchor? And, third, Was the San Tirso moving under her own power at the time of the collision?

The San Tirso, a heavily loaded oil tanker, 420 feet long and of 6,236 gross tonnage, had come into the harbor from the sea on the afternoon of December 13th, and had anchored above Ambrose Channel at 5 p. m., when the visibility was still good. She took her bearings at that time, recording them in her log, and these when plotted at the trial showed her to have been about the middle of the channel between Staten Island and Norton's Point. She put out a 6,800-pound port anchor on a 60-fathom chain which she later increased to 105 fathoms, and did not take it up again till after the collision.

The Pocahontas, 564 feet long and of 10,893 gross tonnage, formerly a transatlantic passenger steamer, but at that time used as a troop transport, had left her anchorage in Gravesend Bay at about 8 p. m. on the same evening with the purpose of proceeding to sea, but, after being under way for some time, was ordered by wireless to return to her anchorage. On account of heavy snow then falling, the visibility was very poor, and, rather than risk collision with other vessels on the anchorage grounds, she determined to anchor where she was, though she was unable to take bearings and had no definite knowledge of her position. Without sighting the San Tirso, she put out her port anchor on a 45-fathom chain.

The storm continued throughout the night with a snowfall of more than 6½ inches, which with other weather conditions produced very low visibility from both vessels. The wind was northeast and about 30 miles an hour until about 2:40 a. m., when within a few minutes it changed to northwest and rose to 88 miles an hour. Shortly after the change, the San Tirso was sighted from the Pocahontas at a distance of about 70 feet off the starboard bow. They came together at an angle of about 70° between the Pocahontas' starboard side and the San Tirso's port side, the latter's stem coming in contact with the Pocahontas on the starboard bow. After the blow, the vessels came alongside and their relative positions changed, so that the San Tirso's bow projected about 20 feet beyond the other's.

210

They remained so till after daylight, when the San Tirso hauled off to starboard.

In the morning, while they were still together, bearings were taken which showed them at a place 1,100 feet southeasterly or to leeward of the position plotted for the San Tirso as of the time she anchored. It is contended by the opposing side that the San Tirso had dragged much of this distance and was seeking to offset it under her own power when the collision occurred; and this, of course, is denied. The difference in the positions of the San Tirso loses much of its significance on the question of whether she dragged, when it is considered that she originally had 60 fathoms of chain out and veered an additional 45 fathoms during the storm, that the wind changed its direction 90°, and that there was probably some inaccuracy in the bearings taken and in the plotting. The difference remains an item of evidence for the Pocahontas, but not very reliable.

On the other hand, it appears quite clear to me that, when the Pocahontas came to anchor, the pilot thought he was on the western side of the channel at a point which would have been westerly from the San Tirso and to windward when the storm broke. Not only did some one on a passing pilot boat inform him that the westerly buoy marking the entrance to Ambrose Channel bore southeasterly from him, but he had been following a course designed to bring him down the westerly side of Ambrose Channel on his way to sea, and in stopping his ship he headed her toward the west as though to anchor out of the way of ships using Ambrose Channel. Furthermore, her navigation officer reported the next day that her position on anchoring was northwesterly from the entrance to Ambrose Channel, and this was corroborated by the report of the captain.

It is true at the trial 15 years later the pilot testified to seeing the easterly buoy of Ambrose Channel, but this contradicts all that he stated soon after the accident. The testimony of Hellweg, captain of the Pocahontas, as to skirting the anchorage grounds on the easterly side near Coney Island, and sighting the ships Antigone and Covington, also seems to me incredible. Not only is it contradicted by his subordinate Sutherland and inconsistent with the anchoring position established in the contemporaneous reports, but it is improbable. Why on so bad a night as that should a steamer intending to go to sea travel over or near a crowded anchorage ground on the wrong side of the channel? Furthermore, the captain was exceedingly evasive in his answers, and seemed determined not to admit any fact which might tend to prove his responsibility for the collision.

Considering only the direct evidence of the locations of the two vessels at the time of anchoring, there is in my opinion a clear preponderance in favor of a finding that the Pocahontas was on the westerly side of the channel at a point to windward of the San Tirso after the storm broke.

The direct evidence that the Pocahontas did not drag was the testimony of the boatswain's mate stationed on the forecastle head to watch the anchor chain and the testimony of an officer who observed the drift line on the stern. The movement of the anchor chain is the most trustworthy means of determining whether the ship is dragging, and the boatswain's mate testified it did not move; but his observation or his recollection after 15 years was so faulty that he did not know there had been a terrific squall in which the wind had increased from 30 miles an hour to 88 miles within a few minutes. The officer testified that the drift line indicated no dragging, but this was a very unreliable test. At just about the time of the collision the Pocahontas' starboard anchor was let go and held underfoot, but whether this was because of the strength of the wind or on account of the proximity to the San Tirso is in doubt.

Immediately after the collision, all the anchor chains lay off to starboard, which was the side upon which the San Tirso lay. It is undisputed that, when the vessels came to rest with the San Tirso projecting 20 feet beyond the bow of the Pocahontas, the latter's chains cut across or under the bow of the San Tirso and the latter's chain also lay off to starboard. I have tried to the utmost of my ability to determine the significance of this fact, but must confess that either through my own stupidity or through the failure of counsel and witnesses to give me sufficient light I am unable to see in it a conclusive circumstance. It seems to me such might have been the position whichever ship had dragged. There are so many unknown or indefinite conditions which would enter into the matter that it is impossible for me to see that the position of the chains was inconsistent with either version of the collision. The speed with which the ships would change their positions with the sudden change in the direction and force

of the wind, the relative rates at which the bow of each ship would change under the influence of the wind in comparison with the rate of its stern, the degree to which the flood tide would offset the effect of the wind, all enter into a determination of what would be the position of the chains. Certainly the Pocahontas with its much larger superstructure would be more influenced by the gale, and it seems to me that, if she had not completed her swing with the change in the direction of the wind, she might have dragged her anchor and approached the San Tirso somewhat broadside. Whether her chain would be leading off to starboard or to port would in part depend upon whether her stern had swung more quickly than her bow.

It is undisputed that the San Tirso engines were working at about the time of the collision. It is her story that she used them only after the collision and not for the purpose of offsetting any drag on her part. According to her engine room log, they were operated at slow ahead at intervals for an aggregate of about four minutes, between 2:50 a. m. and 2:59 a. m., which was after the collision. It is undenied that as the boats approached each other the San Tirso's running lights were lit, indicating that she was navigating, and there is no explanation of this fact. While it is not apparent why the engines should have been worked ahead after the collision, I believe the contemporaneous log entries are correct as to the degree and duration of their operation, and that it was, therefore, not extensive, especially in view of the 88 mile hurricane which was blowing. The difficulties under which the depositions of the San Tirso's witnesses were taken probably account for the incompleteness of the explanation, and I believe that a preponderance of the evidence requires a finding that the engines were worked only after the collision.

Under all the circumstances, it is a most difficult task to determine what were the actual facts, but it seems to me that the probabilities favor the San Tirso. The Pocahontas was anchored to windward, and because of her superstructure was more exposed to the force of the storm. Furthermore, she was more unwieldy in heading into the wind, and had a shorter chain out to hold her. It would have been impossible, of course, for the San Tirso to have dragged bow foremost, and I do not believe that her engine operation was the cause of the collision.

These conclusions are corroborated by the government's formal admissions made in 1921 in a previous suit brought by the owner of the San Tirso which was dismissed. In its answer in that suit the government admitted that "under the combined influence of the wind and tide the S. S. Pocahontas started her anchor and drifted approximately broadside to the wind, down on the S. S. San Tirso, to leeward," but presumably pleaded vis major as an excuse. The admissions were alleged to have been made upon documents and statements in the possession of the government attorney. Certain documents, the quartermaster's notebook and the rough log of the Pocahontas, were not produced at the trial, and undoubtedly they would have been important upon the questions raised. While the evidence shows that they were destroyed in accordance with the regular practice in the Navy, it would seem to have been at least reckless to do so when their importance at any trial involving the serious collision should have been apparent.

Settle decrees accordingly.