109 F.2d 929 (1940)
THE POCAHONTAS.
EAGLE TRANSPORT CO., Limited, et al.
v.
UNITED STATES.
THE SAN TIRSO.
UNITED STATES
v.
EAGLE TRANSPORT CO., Limited.
No. 228.
Circuit Court of Appeals, Second Circuit.
February 26, 1940.
John T. Cahill, U. S. Atty., of New York City (William E. Collins, Sp. Asst. to U. S. Atty., of New York City, of counsel), for appellant.
Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine, of New York City, of counsel), for appellees.
Before SWAN, CLARK, and PATTERSON, Circuit Judges.
SWAN, Circuit Judge.
This is an appeal from a final decree that awarded to the owners of the S. S. San Tirso damages resulting from a collision with the S. S. Pocahontas and dismissed the cross-libel filed by the United States as owner of the latter. The collision occurred in December, 1917, suit was started in 1928, under a special Act of Congress, and an interlocutory decree in favor of the San Tirso was entered in June 1933. Hearings upon the reference to determine damages extended over several years and the final decree was not entered until June, 1938. This appeal attacks the correctness of the interlocutory *930 decree as well as the amount of damages awarded the appellees by the final decree.
The collision occurred at night during a snow storm with wind of hurricane force and while the vessels were at anchor in New York harbor. Each claims that the other dragged her anchor and that she herself was free from fault. On the merits we are content with the decision of Judge Coleman whose opinion holding the Pocahontas solely responsible for the collision is reported in The Pocahontas, D.C., 4 F.Supp. 208. Upon conflicting testimony, much of which was given fifteen years after the events the witnesses attempted to describe, he found that the Pocahontas was anchored to windward of the San Tirso, dragged her anchor and drifted down upon the other vessel, and that the latter's engines were not worked until after the collision. The appellant asks us to reverse these findings of fact and find that the San Tirso was the vessel that moved from her anchorage into collision. But there is ample testimony in the record to support the trial judge's findings, and the same arguments now advanced as to the fault on the part of the San Tirso and freedom from fault by the Pocahontas were presented to him and are discussed in his opinion. We see no adequate reason for reversing his findings and believe he was right in charging the Pocahontas with sole responsibility. The decision on the merits is affirmed on his opinion.
On the issues relating to damages, the commissioner allowed the owners of the San Tirso the cost of temporary repairs and detention damages (loss of charter hire) at New York, and the cost of permanent collision repairs made in London. These amounts, with incidentals, totalled $26,222.75 and neither party now questions them. He allowed nothing for dry-docking or detention in London because subsequent to the collision the San Tirso suffered heavy weather damage which in itself was sufficient to require upon her arrival in London a lay-up for repairs for the full detention period. With respect to these two items the commissioner's report was modified by the district judge, thereby increasing the total award to $58,260.26. Judge Coxe's opinion is reported in The Pocahontas, D.C., 28 F.Supp. 955. This appeal challenges the propriety of any allowance for docking expenses or detention damages in London.
Following the collision the San Tirso was surveyed afloat in New York harbor and Lloyds' surveyor recommended that temporary repairs be made to enable the ship to continue in service and that "the balance of repairs be completed at the first convenient opportunity." All of the collision damage indicated by this report was above the waterline. Upon receipt of Lloyds' report the ship's agent at New York cabled to her London owner that she had been fouled at anchor, her stem turned over and one life boat smashed, and that temporary repairs were being effected on Lloyds' recommendations. As a precautionary measure due to war conditions the owner immediately reserved space at a London dry-dock to be available upon the vessel's expected arrival but, as the commissioner found, the final decision to place her in dry-dock was not made, and would not have been justified, until after her arrival in London, when the owner first learned that underwater damage might have resulted from her riding the anchor chains of the Pocahontas. During the voyage from New York to London the San Tirso suffered extensive heavy weather damage, which was not in any way connected with the collision damage and was itself sufficient to require a lay-up for repairs. After discharging her cargo a survey was commenced afloat and repairs were started; and as soon as a dry-dock was available she was moved to it and remained on dry-dock for 29 days. The balance of the repairs were completed after leaving the dry-dock, the entire period of the lay-up being 57 days and 45 minutes. The collision repairs required the use of the dock for only 10 of the 29 days of dry-docking and the libellants limited their claim to a proportionate part of the entire dry-dock expense.
In an able and detailed report the commissioner found that the collision damage did not render the ship unseaworthy or require an immediate lay-up for repairs in London, although the owner would have been justified in putting her on dry-dock to investigate possible collision damage below the water line; that the heavy weather damage did make her unseaworthy and necessitate an immediate lay-up and that repairs of the heavy weather damage required the whole detention period. He made no finding as to how long a detention would have been required to repair only the collision damage. From an examination *931 of the testimony the district judge found that the whole period of the lay-up was necessary for either class of repairs. He concluded that the collision was the proximate cause of the lay-up and that the libellants were entitled to the damages claimed for dry-docking and detention despite the heavy weather damage which in itself would have required lay-up.
The principle to be applied in awarding damages to the owner of a vessel injured in collision is simple; it is the rule of restitutio in integrum. The Winfield S. Cahill, 2 Cir., 258 F. 318, 321. Strictly, the measure of damages is the difference in value of the ship before and after the collision, but the cost of the necessary repairs and the loss of earnings while they are being made have long been regarded as its equivalent. Pan-American Petroleum & Transport Co. v. United States, 2 Cir., 27 F.2d 684, 685. If the collision damage is serious enough to necessitate an immediate lay-up for repairs, the owner may charge the tort-feasor with what the vessel would actually have earned during the detention period; and there will be no abatement of the amount because the owner chooses the occasion to accelerate his annual overhaul or to repair damage for owner's account of a character not necessitating an immediate lay-up and not extending the detention period beyond the time required for collision repairs. Clyde S. S. Co. v. City of New York, 2 Cir., 20 F.2d 381, and cases therein cited. Even if the collision damage does not in fact require immediate repairs, the owner may in good faith and reasonably believe that it does; and, in that event, he would be justified in sending her to dry-dock. See Pan-American Petroleum & Transport Co. v. United States, supra, 27 F.2d at page 685. In such a case, if dry-docking discloses that the vessel is still seaworthy and if the owner nevertheless decides to proceed with permanent repairs rather than to return the vessel to service and postpone permanent repairs until the period of general overhaul, the question will arise whether detention damages will be for the owner's account or the tort-feasor's. It would seem that the answer should depend on what is reasonable conduct under all the circumstances and in the light of the rule that even a tort-feasor is entitled to the benefit of the principle of avoidable damages. See The Baltimore, 8 Wall. 377, 387, 19 L.Ed. 463. The foregoing discussion presupposes that nothing has occurred subsequent to the collision to necessitate a lay-up of the vessel for repairs for the owner's account.
In the case at bar the situation is complicated by such a subsequent event; the heavy weather damage which in itself rendered the vessel unseaworthy when she reached London. The commissioner found that no decision to lay her up for collision repairs could reasonably have been made, and none was made, until her arrival, when the owner first learned that she had ridden over the chains of the Pocahontas; that this information justified an inspection for underwater collision damage and was one of the reasons for putting the San Tirso in dry-dock; that the dry-dock inspection disclosed no collision damage which would have prevented another voyage but that the heavy weather damage did render her unseaworthy and necessitate an immediate lay-up. The district judge construed the commissioner's report as a finding that the owner justifiably decided to lay up the vessel for collision repairs. We do not so read it. The commissioner found merely that the possible underwater collision damage was one of the reasons, and a justifiable one, for dry-docking, but that the lay-up was necessary in any event because of heavy weather damage. The commissioner and the district court differed as to the legal effect of this fact. In our opinion the commissioner was right in disallowing the claim for detention damages.
The appellees argue that if each of two events necessitates a dry-docking and lay-up for repairs, and the repairs are then made concurrently, the earlier event in point of time is the proximate cause of the vessel's detention because the later event adds nothing to the necessity which already exists. We have already called attention to the fact that the collision damage did not necessitate a lay-up for collision repairs, although it did furnish a justifiable reason for putting the vessel in dry-dock for inspection. But if the premise posited by the appellees were to be accepted, the asserted conclusion can not be granted. Events subsequent to the collision may demonstrate that during the detention period the vessel would have made no earnings even if there had been no collision. Thus, for example, if a collision necessitated a lay-up for repairs which would take 30 days and after 10 days the *932 vessel were completely destroyed by fire, we believe it clear that the tort-feasor could not be charged with loss of earnings for more than the 10 days. An analogy may be found in personal injury cases. In Rouse v. Michigan United Rys. Co., 164 Mich. 475, 129 N.W. 719, suit was brought by the administratrix of the injured man, who had subsequently died from a cause other than the injury. An instruction was sustained to the effect that compensation for loss of earning power caused by the injury could not be given for any period beyond the decedent's death, regardless of his life expectancy at the time of the tort. To the same effect is Payne v. Georgetown Lumber Co., 117 La. 983, 42 So. 475; Memphis St. Ry. v. Prince, 2 Tenn.Civ. App. 688. In The Chekiang, 30 Com.Cas. 228, at 234, Lord Justice Banks discusses the very situation posited by the appellees' argument and expresses an opinion adverse to their contention, as follows: "If the fact be that the whole of the time during which the vessel was detained was occupied by the repairs necessary to make good the collision damage, and by necessary owner's repairs, the work on both proceeding simultaneously and continuously and occupying the whole time, the owner in my opinion would fail to establish a case for anything beyond nominal damages. In such a case as that, on his own showing the vessel was not detained for a moment longer than was necessary to carry out urgently needed repairs, quite apart from the collision damage." See language to same effect in Admiralty Commissioners v. The Chekiang, L.R.[1926] A.C. 637, at 642, reversing the Court of Appeal on other grounds. Equally apt is the statement of this court in Clyde S. S. Co. v. City of New York, supra, to the effect that if the ship would in any event go out of commission, collision or no collision, the owner cannot be said to have been damaged, since during the period when the collision repairs were actually made she would have earned no profits for her owner. This is true in the case at bar; the San Tirso being unseaworthy by reason of heavy weather damage could have earned no charter hire during her detention period, collision or no collision. See also The Winfield S. Cahill, 2 Cir., 258 F. 318, where this court denied recovery of loss of charter hire because the damaged vessel had been "blacklisted" for reasons of state; and Douglas, Burt & Buchanan Co. v. Texas & P. Ry. Co., 150 La. 1038, 91 So. 503, 504.
In support of their contention the appellees rely heavily upon The Haversham Grange [1905], Prob.Div. 307. There, the libellant's ship was in collision with two different vessels on successive days and each collision did damage sufficient to put her out of commission. In a suit against the second tort-feasor it was held that damages for the whole detention period must be recovered from the first. It is difficult to harmonize that decision with the principles and decisions above discussed; but it may be noted that no one disputed that the owner of the injured vessel was entitled to damages for the full detention period from one or the other of the wrongdoers. This was pointed out in The Chekiang, L.R.[1926] A.C. 637, 652. It may also be noted that English law permits recovery for loss of potential earning power and not merely for loss of earnings which would actually have been made except for the detention for collision repairs. See The Astrakhan [1910], P.D. 172. The Haversham Grange is distinguishable from the case at bar, for here, as already stated, the collision did not necessitate a lay-up for collision repairs. Whether we should follow it upon its exact facts we need not now say. Cf. the comment of this court in Clyde S. S. Co. v. City of New York, 2 Cir., 20 F.2d 381, 382.
Both parties appear to agree that any claim for dry-docking expense should follow our disposition of the claim for detention damages. We shall treat them on that assumption and deny both in toto. The final decree is modified accordingly. Half the appellate costs are awarded the appellant.