DEMETRIUS MARITIME COMPANY, LTD., and Saint Olga Maritime Co., Ltd., as Owner and Bareboat Charterer respectively of the motor vessel "ST. PANTELEIMON," Plaintiffs,

v.

S/T "CONNECTICUT," her engines, tackle, etc., and Connecticut Transport, Inc., Defendants.

No. 75 Civ. 3271 (JEL).

United States District Court, S. D. New York.

Jan. 9, 1979.

Dickerson, Reilly & Mullen, New York City by Robert W. Mullen, New York City, for plaintiffs.

Burlingham, Underwood & Lord, New York City by Joseph C. Smith, New York City, for defendants.

LUMBARD, Circuit Judge: *

On June 15, 1975, defendant Connecticut Transport, Inc.'s ship the S/T Connecticut collided with the St. Panteleimon, then owned by co-plaintiff Demetrius Maritime Company, Ltd. and under bareboat charter to co-plaintiff St. Olga Maritime Co., Ltd., while the latter ship was moored at the Robinson Terminal on the Gulf of Mexico at Galena Park, Texas. Defendant has conceded liability and the proper measure of damages is the only question remaining.

A joint survey of the damages the St. Panteleimon allegedly suffered from the collision was undertaken on June 19, 1975.[1] The team of three surveyors prepared estimates of the cost of repair but determined that the St. Panteleimon remained seaworthy and that the alleged collision damages would not require immediate attention. Since at the time of the collision the St. Panteleimon was under charter to a third party at the rate of $3,800 per day, the decision was made to keep the ship in operation and to defer repairs until her next regularly scheduled dry-docking.

Before, however, the St. Panteleimon was docked for regular maintenance and before any repair of the alleged collision damages was attempted, the ship's owner encountered financial difficulties which resulted in the ship's forced sale at public auction in November of 1975. Under the new owners, the ship, renamed the Michelle F, continued sailing for a brief time in her damaged condition, and was finally dry-docked for maintenance and repairs in early 1976.

Strictly, the measure of recovery for the owner of a vessel damaged by the negligence of another is the difference in value of the ship before and after the collision,[2] but the cost of necessary repairs and demurrage, profits lost while repairs are being made, have long been accepted as its equivalent. The *Pocohantas,* 109 F.2d 929 (2d Cir. 1940); *Pan-American Pet. and Transp. Co. v. United States,* 27 F.2d 684 (2d Cir. 1928). Since the cost of restoring a damaged vessel to its prior condition is effectively a measure of the reduction in the ship's value, the fact that no repairs or only partial repairs are actually made will not defeat the owner's right to recovery. *Bleakley Transp. Co. v. Colonial Sand & Stone Co.,* 245 F.2d 576 (2d Cir. 1957).

The most reliable source as to the cost of repairing the St. Panteleimon is the joint

---

* Sitting by designation.

1. The joint survey was attended by a Mr. Kanapaux, representing the St. Panteleimon's owners, a Mr. Ames of U.S. Salvage Association, Inc. and a Mr. Johnson of the Salvage Association. Though the party in interest represented by Mr. Ames was not disclosed at the time of the survey, plaintiffs contend in their post-trial brief that he attended the survey on behalf of the defendant. There is no clear evidence to support this claim but we note in any event that defendant was notified that the survey would be held and thus had the opportunity to attend.

2. At trial, plaintiffs presented the testimony of Costas Xistris, a marine consultant, as to the effect of the alleged collision damage on the market value of the St. Panteleimon. Though Mr. Xistris appeared a competent and credible witness, his testimony provides no satisfactory basis for measuring plaintiffs' damages. In the first place, Mr. Xistris' estimation of the St. Panteleimon's value in undamaged condition was imprecise. Secondly, the circumstance of the St. Panteleimon's forced sale makes any estimate of the unrepaired ship's market value highly speculative.

survey conducted only four days after the collision.[3] Roy Kanapaux, who attended the June 19, 1975 survey on behalf of the St. Panteleimon's owner, testified at trial and proved a highly competent and credible witness. His estimate at the time of the survey was that repair of the damages allegedly caused by the collision would require the St. Panteleimon to be docked for nine days and cost a total of $42,100, broken down as follows:

| | | |
|---|---|---|
| 1. | Steel—Plating | $ 10,000.00 |
| 2. | Fairing (Internals) | 2,000.00 |
| 3. | Removals and Replacements in Messroom | 4,000.00 |
| 4. | Removals and Replacements in Storeroom and Reefer Boxes and Repairs | 5,000.00 |
| 5. | Examination and Repair to Stripping Pump | 1,000.00 |
| 6. | Bulkhead Flange, No. 3 Port Center and No. 1 Port Wing Tank; Port Side Rub Guard | 1,100.00 |
| 7. | Mooring Lines | 6,000.00 |
| 8. | Common Charges (charges associated with placing ship in dry-dock and preparing her for repair) | 13,000.00 |

■ The defendant has not challenged the basic credibility of the Kanapaux survey but has raised a number of objections to the survey's adequacy as a measure of plaintiffs' damages. It contends first that damage items five and six were not proximately caused by the collision. With regard to item five, Kanapaux's testimony indicated that the St. Panteleimon's stripping pump was damaged when it was started by the crew immediately after the collision. Defendant argues, and the court agrees, that under those circumstances the collision, though perhaps the precipitating factor, was not the legal cause of the damage to the pump. Since there is no evidence that the conditions created by the collision were such as to make damage to the pump a likelihood, I conclude that the pump's improper operation by the crew or pre-existing damage were responsible for its condition, not the collision.

■ With respect to item six, external damage to the St. Panteleimon's port side, defendant argues that there is no indication that the collision, which occurred at the opposite end of the ship, was responsible. Though there is some suggestion in the record that the impact of the collision on the St. Panteleimon's starboard side forced the ship to scrape its port side against the dock, I agree with defendant that the evidence is insufficient to justify recovery for this item. No witnesses as to the collision were produced at trial nor was there any other direct evidence tying the collision to the port side damage. The plaintiffs surely had the opportunity to produce such evidence if it existed, and, consequently, recovery for this item must be disallowed.

■ Defendant also contends that item seven, the cost of replacing the St. Panteleimon's mooring lines, must be disallowed because the lines, despite some damage, remained in usable condition. Kanapaux testified, however, that the mooring lines, though possibly usable for some other purpose, were no longer suitable for mooring and would have to be replaced. Since the defendant failed to produce evidence as to what if any salvage value the damaged mooring lines might have, I conclude that the cost of new lines is a proper item of recovery.

■ The defendant's final objection relates both to the common charges in the Kanapaux estimate and to plaintiffs' claim

---

**3.** Defendant produced no survey of its own as to the extent of the damages suffered by the St. Panteleimon. Though the plaintiffs placed in evidence a survey by one Russell Brierly that indicated a somewhat higher cost of repairing the St. Panteleimon's damages than did the Kanapaux survey, the Brierly survey was not made until May of 1976, nearly a year after the collision. Obviously, there is a greater danger that unrelated damages will be included in a survey prepared so long after the actual incident. In addition, where, as in the instant case, a ship is damaged but the owner does not effect repairs, the proper measure of recovery is the estimated cost of repairs at a time immediately following the accident. Gilmore & Black, The Law of Admiralty, 2d Ed. at 527.

for demurrage. Defendant argues that since the St. Panteleimon remained seaworthy after the collision and was to be repaired only at her next scheduled dry-docking, plaintiffs cannot recover, as items of damage, such common charges and demurrage as would have resulted from routine maintenance.

Defendant's position is in accord with the settled law of this circuit. If collision repairs are to be made while a ship would in any event be out of commission, earnings that would be lost during the time of repair and the expense of placing the ship in dry dock cannot be regarded as consequences of the collision. *See Clyde S.S. Co. v. City of New York,* 20 F.2d 381 (2d Cir. 1927). It follows that plaintiffs may recover only to the extent that repair of the collision damage would have increased the common charges and demurrage incident to regular maintenance.

With regard to the common charges, Kanapaux testified at trial that the owner would be required to pay for line handlers and gangway services, for a fire line, and for clearing and gas freeing the vessel and obtaining a gas free certificate, if the vessel were brought in for regular maintenance. Since those charges totalled $7,750 and since the defendant conceded at trial that the other common charges were specifically attributable to the damages caused by the collision, plaintiffs' recovery on this item must be limited to $5,250.

■ With respect to demurrage, plaintiffs contend they are entitled to nine days lost profits in accord with the Kanapaux estimate as to the time required for repairs. Defendant, on the other hand, contends that repair of the collision damage would not have extended the time that the St. Panteleimon would have been off-hire for regular maintenance. Unfortunately, neither side has introduced evidence as to the length of time required for ordinary maintenance repairs and more importantly as to how much, if at all, that time would be increased by simultaneous repair of the collision damage. Since this court will not speculate as to what, if any, earnings would have been lost, no recovery for demurrage can be allowed.

■ Plaintiffs are, of course, entitled to recover $1,343.47 for the cost of the June 19, 1975 survey and thus the total amount due them is $33,593.47, on which amount interest is allowed from the time of the collision.

The above opinion constitutes the court's findings of fact and conclusions of law. Rule 52, Fed.R.Civ.Pro.