BOUCHARD TRANSPORTATION CO. INC. and John & Frederick Barge Corp., Plaintiffs-Appellants,

v.

The TUG "OCEAN PRINCE", her engines, brokers, tackle, furniture and apparel in rem and Red Star Marine Services, Inc., and Red Star Towing and Transportation Co., Inc., in personam, Defendants-Appellees.

No. 946, Docket 81–7851.

United States Court of Appeals, Second Circuit.

Argued April 5, 1982.

Decided Oct. 18, 1982.

**610**

George F. Brammer, Jr., New York City (Grainger & Tesoriero, New York City, of counsel), for plaintiffs-appellants.

Richard E. Meyer, New York City (McHugh, Leonard & O'Connor, New York City, of counsel), for defendants-appellees.

Before KEARSE and PIERCE, Circuit Judges, and LEVAL,* District Judge.

* Honorable Pierre N. Leval, of the United States District Court for the Southern District of New York, sitting by designation.

LEVAL, District Judge:

Plaintiff Bouchard Transportation Co. (Bouchard), the owner of a damaged barge, appeals from a final judgment of the United States District Court for the Southern District of New York after a nonjury trial before Judge Whitman Knapp. Defendant, the tug Ocean Prince, which had the barge in tow, conceded liability for the collision. Judge Knapp awarded damages for surveying costs—$550; for repair costs—$10,900; and for chemist costs—$420. He denied damages for the cost of gasfreeing the barge's tanks, as well as for loss of profits while the barge was out of service during the repairs. These denials are the subject of this appeal.

*Facts*

Bouchard's tank barge B No. 55 was being towed by the tug Ocean Prince from Astoria to the Brooklyn Army Base on September 9, 1979. The barge's tanks were empty, although not free of gas or other petroleum residue. At about 8:05 a. m., the tug slowed; the barge, continuing to advance on its momentum, rammed the tug's stern caprail, which punctured the wrapper plate of the barge's forward port-side tank about five feet above the water line, making a crack six to eight inches long, ¼ to ½ inch wide.

Upon learning of the collision, Bouchard directed that the barge be towed to the Standard Tank Cleaning Corporation in Bayonne, New Jersey, for gasfreeing. Gasfreeing is the removal of volatile and toxic petroleum fumes from the tanks and is a prerequisite to the performance of welding and other repairs. After this operation was completed on September 16, Bouchard moved the barge to the yard of Caddell Dry Dock and Repair Company on Staten Island for drydocking and repairs. At the drydock, marine surveyors acting on behalf of both parties examined the collision damage on September 18 and agreed that the repair

of the collision damage would require six working days and would cost $10,900. The joint survey report also recommended that permanent, rather than temporary, repairs be made. These repairs were then carried out.

The barge was scheduled to undergo biennial inspection as required by the Coast Guard two months later in November 1979. It also had certain items of damage previously outstanding, which were expected to be repaired during the inspection lay-up in November. The barge had been grounded by another tug, causing damage to its bottom plates. Also, one of the pumps used to discharge cargo was not operating and needed repairs. Because the collision damage called for immediate lay-up and repair, Bouchard decided to accelerate the outstanding repairs and the required inspection, conducting all of these during the lay-up occasioned by the collision. All repairs were completed on October 17, with a total of twenty working days consumed.

The trial judge found that "permanent repairs ... were necessary." [1] Joint Appendix at 131a. The collision repairs were performed simultaneously with the more extensive and time-consuming owner's repairs in different areas of the barge. The owner's work required a gasfree vessel. No finding was made as to whether the collision repairs required gasfreeing the entire barge or only the forward tanks.

In denying liability for detention, Judge Knapp relied upon a dictum of Judge Swan in *The Pocahontas*, 109 F.2d 929, 931 (2d Cir.), *cert. denied,* 310 U.S. 641, 60 S.Ct. 1088, 84 L.Ed. 1409 (1940). That dictum was understood by Judge Knapp to suggest that detention damages should not be awarded if owner's repairs performed during the same lay-up as the necessary collision repairs extend the detention period beyond the time required for the collision repairs. Because this proposition does not correctly state the law of the circuit, we reverse and remand.

*Discussion*

Since it is costly to take a commercial vessel out of service, owners commonly permit damage not requiring immediate attention to await a time when the vessel will be laid up for another reason. Similarly, if a vessel is unexpectedly taken out of service for repairs resulting from a collision, it is a common practice for owners to take advantage of the drydocking and lay-up to perform previously outstanding repairs. In such instances, owners may also accelerate periodically required inspections so that they will not require an additional lay-up.

When part of the work done in the lay-up is attributable to a collision caused by a tortfeasor (referred to in this opinion as "collision repairs") and part is other work not chargeable to a tortfeasor (referred to as "owner's work"), disputes arise as to how common expenses and losses should be allocated. The tortfeasor will contend that the owner receives the unfair benefits of a free ride if he recovers for such common expenses and loss of earnings although using the time to perform owner's work, which would inevitably have subjected the owner to the same costs at a future date. Owners argue conversely that the tortfeasor gets a free ride if he escapes liability only because of the owner's prudence in taking advantage of the lay-up to do other work. Neither argument is completely without merit. Each points up imperfection in the attempt to achieve the stated goal of *restitutio in integrum;* making the owner whole, or giving him the difference between the value of the vessel before and after the collision. *The "Potomac",* 105 U.S. 630, 631, 26 L.Ed. 1194 (1882); *The Baltimore,* 75 U.S. (8 Wall.) 377, 385, 19 L.Ed. 463 (1869); *Williamson v. Barrett,* 54 U.S. (13 How.) 101, 110, 14 L.Ed. 68 (1851); *The Winfield S. Cahill,* 258 F. 318, 321 (2d Cir. 1919).

In making him whole, the owner of a vessel damaged through the fault of an-

---

**1.** Although Judge Knapp did not say explicitly that the repairs were *immediately* necessary, this is the fair inference of his findings. Also, without having expressly ruled on the issue, Judge Knapp appears to have found that the owner's decision to make immediate repairs was reasonable and in good faith. *See Skibs A/S Dalfonn v. S/T Alabama,* 373 F.2d 101, 104 (2d Cir. 1967); *infra note 4.*

other is entitled, over and above the cost of collision repairs, to an award for actual profits lost during the detention necessary to make the repairs. Such actual lost profits [2] must be proven with a reasonable degree of certainty. *The Conqueror,* 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937 (1897).[3] If the owner manages his affairs in such a fashion that no profits are lost during repairs, there is no detention loss to be awarded. *Brooklyn Eastern District Terminal v. United States,* 287 U.S. 170, 174–76, 53 S.Ct. 103, 104, 77 L.Ed. 240 (1932) (dictum); *Bolivar County Gravel Co. v. Thomas Marine Co.,* 585 F.2d 1306, 1308–09 (5th Cir. 1978); *The Pocahontas,* 109 F.2d at 931 (dictum); *Pan-American Petroleum & Transport Co. v. United States,* 27 F.2d 684, 685 (2d Cir. 1928); *see The Conqueror,* 166 U.S. at 127, 17 S.Ct. at 517 ("[S]omething else must be shown than the simple fact that the vessel was laid up for repairs."); *The Saginaw,* 95 F. 703, 704 (S.D.N.Y.1899) ("The practice in this district has been not to admit claims for the vessel's time while making repairs, if it occasioned no loss of her regular trips, or other expense.").

■ The difficulty here attaches to losses and costs that are commonly attributable both to the repair of the tort damage and to owner's work. As to such jointly caused detention losses, the owner's entitlement to damages has been held to turn on whether or not the collision damage required immediate repair, taking out of service a vessel which otherwise would have been in service. If the vessel were kept in service following the collision and the repairs were deferred by the owner to the time of the next lay-up, to be done at that time together with owner's work, no detention damages would be allowable for the time commonly attributable to both kinds of repairs. In these circumstances, it is reasoned that the collision did not require the interruption of service; the repairs, being deferable, could be performed during a future period of scheduled interruption of service, without loss of profits to the owner. *Skibs A/S Dalfonn v. S/T Alabama,* 373 F.2d 101, 104 (2d Cir. 1967) (dictum); *Pan-American Petroleum & Transport Co. v. United States,* 27 F.2d at 685; *see The Pocahontas,* 109 F.2d at 931; *Clyde S.S. Co. v. City of New York,* 20 F.2d 381, 381 (2d Cir. 1927); *Commissioners for Executing Office of Lord High Admiral v. Owner of Steamship Chekiang,* 1926 A.C. 637, 641 (Viscount Dunedin).[4] If on the

---

**2.** Detention is "[d]amages for lost profits arising from the loss of use of a vessel for repairs after a collision or other maritime tort." *Bolivar County Gravel Co. v. Thomas Marine Co.,* 585 F.2d 1306, 1308 n.2 (5th Cir. 1978). The measure of detention is "the amount the vessel would have earned in the business in which she has been customarily employed." *Moore-McCormack Lines, Inc. v. The Esso Camden,* 244 F.2d 198, 201 (2d Cir.) (citing *Williamson v. Barrett,* 54 U.S. (13 How.) 101, 110, 14 L.Ed. 68 (1851)), *cert. denied,* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 37 (1957). The term "demurrage" is frequently used in the cases to mean detention, even though, technically, it has a different meaning. *Black's Law Dictionary* 389 (5th ed. 1979) (demurrage is contractual sum given shipowner for use of his ship beyond time fixed by charter-party).

**3.** This requirement that actual loss be proven to recover detention differs from the rule for the recovery of repair damages. In order to recover the latter, the plaintiff need not prove that the repairs were ever in fact made. *Bleakley Transportation Co. v. Colonial Sand & Stone Co.,* 245 F.2d 576, 578 (2d Cir. 1957); *Demetrius Maritime Co. v. S/T "Connecticut",* 463 F.Supp. 1108, 1109 (S.D.N.Y.1979). In the case of consequential damages, such as detention, the rule of certainty requires "a reasonable degree of persuasiveness in the proof of the fact and of the amount of damage." C. McCormick, *Handbook on the Law of Damages* § 26, at 99 (1935). *See generally Commissioners of Executing Office for Lord High Admiral v. Owners of Steamship Chekiang,* 1926 A.C. 637, 643–45 (Lord Sumner) (special damages require specific loss); C. McCormick, *supra,* § 28, at 105–06 (discussing general and special damages). This distinction between repair and detention damages is merely a matter of guaranteeing that the owner has suffered the loss before awarding damages. As to physical damage, the loss of value is obvious whether or not the repair is made; claims for detention damages, however, have no physical manifestations.

**4.** The owner's reasonable and good faith decision to make immediate repairs is generally determinative. *Skibs A/S Dalfonn v. S/T Alabama,* 373 F.2d at 104; *Ellerman Lines, Ltd. v. The President Harding,* 288 F.2d 288, 289–90 (2d Cir. 1961); *see Pan-American Petroleum &*

other hand collision repairs are immediately necessary, the owner may conduct his own repairs at the same time, and is entitled to an award of detention for the period common to both the collision and owner's repairs. *Skibs A/S Dalfonn v. S/T Alabama,* 373 F.2d at 104 (dictum); *Oil Screw Noah's Ark v. Bentley & Felton Corp.,* 322 F.2d 3, 9 (5th Cir. 1963); *Atlantic Refining Co. v. Matson Navigation Co.,* 253 F.2d 777, 778 (3rd Cir. 1958); *Hines v. Sangstad S.S. Co.,* 266 F. 502, 506–07 (1st Cir. 1920); *Simpson's Patent Dry-Dock Co. v. Atlantic & E.S.S. Co.,* 108 F. 425, 428 (1st Cir.), *cert. denied,* 183 U.S. 697, 22 S.Ct. 934, 46 L.Ed. 395 (1901).

As to the latter situation, Judge Learned Hand in an often cited dictum explained the proposition as follows:

> If the owner of a damaged vessel puts her in dry dock to repair damages done by a collision, and while she is there seizes the opportunity to make other repairs, which do not extend the time consumed in the collision repairs, the tort-feasor may not abate his damages.

*Clyde S.S. Co. v. City of New York,* 20 F.2d at 381. In *The Pocahontas* dictum, Judge Swan, citing *Clyde S.S. Co.,* restated it with a slight change of emphasis which caused some confusion at the trial below. He wrote:

> If the collision damage is serious enough to necessitate an immediate lay-up for repairs, the owner may charge the tortfeasor with what the vessel would actually have earned during the detention period; and there will be no abatement of the amount because the owner chooses the occasion to accelerate his annual overhaul or to repair damage for owner's account of a character not necessitating an immediate lay-up and *not extending the detention period beyond the time required for collision repairs.* Clyde S.S.

Co. v. City of New York, 2 Cir., 20 F.2d 381, and cases therein cited.

109 F.2d at 931 (emphasis added).[5]

Judge Swan's formulation is literally correct. There should indeed be no abatement if owner's repairs do not extend "the detention period beyond the time required for collision repairs." The problem is that it can be taken to imply, and was understood by Judge Knapp to mean, that no detention damages should be awarded if the owner's work does extend the detention period. Judge Knapp understood the negative inference in Judge Swan's formulation as a *condition* to the recovery of detention damages when it was intended only as a measurement or maximum limitation of the amount of detention damages properly awarded.

Judge Hand's statement looks not at the duration of the detention period, which is irrelevant, but at "the time consumed in the collision repairs." 20 F.2d at 381. The owner, of course, is not entitled to recover damages for any detention period longer than that consumed in the collision repairs, since this loss of profits is not attributable to the tortfeasor. What Judge Hand's concluding limitation adds is that even the time consumed in collision repairs may not be recoverable in its entirety if inefficiency or interference resulting from the simultaneous performance of owner's work extends the time consumed by the collision repairs. If, for example, fifteen days were consumed in necessary collision repairs, the tortfeasor is presumptively obliged to pay for fifteen days detention. But if the tortfeasor can show that collision repairs would have taken only nine days but for owner's repairs simultaneously conducted which delayed the progress, then the defendant would have shown, in Judge Hand's words, that the "other repairs, ... [did] extend the time consumed in the collision repairs," *id.,* and he would be entitled to "abate" the dam-

---

*Transport Co. v. United States,* 27 F.2d 684, 685–86 (2d Cir. 1928) (owner's belief that vessel is unseaworthy due to collision must be well founded).

5.  The propositions quoted were unnecessary to the decisions of *Clyde* and *The Pocahontas,* which were cases of nonnecessary deferred collision repairs that were performed during a later lay-up. Common expenses were accordingly not allowed.

ages from the fifteen days actually taken for collision repairs to the nine that would have been consumed had there been no owner's work done. This result remains the same no matter how long the owner's work keeps the ship out of service. Judge Swan's formulation works the same way. Using his words, if the owner's repairs "of a character not necessitating an immediate lay-up" do extend the detention period "beyond the time required for collision repairs," 109 F.2d at 931, the detention loss will be "abated" (reduced) by the extent to which the detention period exceeded what was necessary to repair the collision damage.

This understanding is consistent with other decisions of this court. In *The Bergen*, 128 F. 920 (2d Cir. 1904) (per curiam), both necessary collision repairs and apparently nonnecessary owner's repairs were done simultaneously. *Id.* at 920–21. The court approved a finding of five days of detention damages because the commissioner was careful to discriminate between detention for the repairs necessitated by the collision and additional detention for the painting of the vessel. *Id.* at 921. Judge Hand explained in *Pan-American Petroleum & Transport Co.* that "The Bergen, 128 F. 920 (C.C.A. 2), stands only for the doctrine that in the case of necessary collision repairs the detention damage must be limited to such time as is required for them alone, an obvious conclusion." 27 F.2d at 685. These two decisions make clear that when owner's repairs extend the detention period of a vessel beyond that required by the collision repairs, the tortfeasor remains responsible for necessary collision detention, although he is not responsible for the extra time. *See also Compania Pelineon de Navegacion, S.A. v. Texas Petroleum Co.,* 540 F.2d 53, 56 (2d Cir. 1976) (citing *The Pocahontas*) (nonnecessary collision repairs) ("[T]he evidence justified the holding below that the vessel may recover lost profits only for that portion of the Hoboken repair period by which Tumaco collision repairs extended the time which the owner's routine repairs re-

quired."), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Oil Screw Noah's Ark v. Bentley & Felton Corp.*, 322 F.2d at 9 (necessary collision and necessary owner's repairs) (detention recoverable even though owner's repairs extended time of detention, but only detention allocable to collision repairs allowed); *Demetrius Maritime Co. v. S/T "Connecticut"*, 463 F.Supp. 1108, 1111 (S.D.N.Y.1979) (nonnecessary repairs) ("[P]laintiffs may recover only to the extent that repair of the collision damage would have increased the common charges and demurrage incident to regular maintenance.")

A rule which made recovery contingent on the duration of owner's work would be both illogical and counterproductive. First, it makes no logical or equitable difference how long the owner's repairs keep the vessel out of service, so long as the defendant is not being charged for more than his proper due. Second, to deny the owner any recovery merely because his repairs extend the time out of service would encourage owners to defer repairs, a consequence which is surely contrary to the interests of safety and economic efficiency.

▬ The facts of this case thus fall within the well recognized principles. Were it not for the September 9 collision with the tug, the barge was seaworthy and would have continued in service during the period of lay-up. The collision necessitated immediate repairs, consuming six days. The vessel was taken out of service for the performance of those repairs, losing profits during the lay-up.[6] Owner's work was performed at the same time which did not prolong the six day's needed for the collision work (although it did prolong the period out of service). The tortfeasor is therefore responsible for those six days of lost profit. The fact that the owner kept the vessel out of service for an additional time is of no concern to the tortfeasor, such additional time being at the owner's sole expense.

---

**6.** The parties stipulated to $2,300 of lost earnings per day. Joint Appendix at 68a (tran-    script).

While most of the discussion in the cases concerns the allocation of loss of profits during detention, the same analysis applies to other types of common charges. In *Skibs A/S Dalfonn v. S/T Alabama,* the allocation rule was phrased to include the common expenses of gasfreeing and drydocking as well as detention. 373 F.2d at 104 (in case of necessary repairs, owner "was entitled to recover as damages all of the costs of repair, including those which were common both to the collision and to the annual overhaul"); *see also Valdesa Compania Naviera, S.A. v. Frota Nacional de Petroleiros,* 348 F.2d 33, 39 (3d Cir. 1965) (drydocking and inspection expenses given same analysis as detention); *Demetrius Maritime Co. v. S/T "Connecticut",* 463 F.Supp. at 1111 (same analysis of common charges for gasfreeing, gangway services, line handlers, and fire line). *The Pocahontas* itself involved common drydocking expenses as well as damages for detention, and Judge Swan, noting that the parties consented, treated both sets of damages under the same rule. 109 F.2d at 932. Thus, if a tortious collision puts a vessel out of service and the necessary repairs require gasfreeing and drydocking, the cost of these would be awarded against the tortfeasor in spite of the fact that the owner took advantage of the gasfreeing and drydocking to do owner's work, at least to the extent that the owner's work did not increase those costs. Conversely, in accordance with the *holding* of *The Pocahontas,* if the collision does not require the ship to go out of service, but it is taken out, gasfreed and drydocked at a later time for owner's work, no award would be made for these expenses despite the fact that they were utilized also for the collision repairs, except to the extent that the collision repairs increased such costs above what the owner's work required.

Because he took the view that no gasfreeing costs were awardable, Judge Knapp did not consider whether the collision repairs required the gasfreeing of only the forward tanks or of the entire vessel. If only the forward tanks were required to be gasfreed to make the collision repairs, then the gasfreeing of the remainder of the vessel was solely for the purpose of owner's work, was not a common cost, and was not chargeable to the tug.

It is therefore our conclusion, based upon Judge Knapp's finding that the collision required immediate repair, that the owner of the barge was entitled to recover for six days loss of profits and the cost of gasfreeing to the extent that it was necessary to repair the collision damage. The latter determination must be made on remand.

The foregoing represents the opinion of the court. What follows expresses a concern [7] that such an award, made without allowance for substantial savings realized by the owner, might result in substantial overcompensation and that a measure of damages can be found which more accurately compensates the owner for his loss. The mandatory biennial inspection with attendant repairs was found to be firmly and unavoidably scheduled only six weeks ahead. By advancing these to piggyback on the repairs conducted for the tortfeasor's account, the barge owner avoided the need to incur detention losses and cleaning costs only six weeks hence. Judge Knapp noted that the collision repairs "did not extend the time the ship was out of service by a single day and did not require any gasfreeing of the vessel that was not inevitable prior to the accident." Joint Appendix at 132a. It appears that most of the costs that the owner seeks to charge to the tortfeasor were offset by proven measurable savings to the owner. The question arises whether an award that failed to give appropriate allowance for those savings is economically sound and justifiable, or whether it overstates the damages suffered. Especially for larger ships involving high drydocking and cleaning costs and large potential detention losses, the amounts of potential awards vulnerable to such argument may be enormous. Accepting the propositions quoted above from *Clyde* and *The Pocahontas* that the owner's award of lost profits should not

**7.** Judges Kearse and Pierce express no view as to this portion of the opinion.

be lessened merely because he utilizes the time out of service to perform owner's work, a question arises whether the tortfeasor should be entitled to some form of credit if he can prove that by acceleration the owner had mitigated his damages, avoiding a provable necessary subsequent lay-up in which profits would have been lost and cleaning expenses incurred.

If so, it may be economically more sound to utilize a cost of money approach to measure the owner's loss resulting from acceleration of lay-up, drydocking, gasfreeing and other common costs.[8]

The issue is not a simple one. The parties have not briefed it, perhaps because this case involves relatively small amounts of money. The question is therefore left open for possible future exploration.

The judgment is reversed and remanded to the district court.

---

**8.** The Third Circuit analyzed the problem in a somewhat similar fashion in *Valdesa Compania Naviera, S.A. v. Frota Nacional de Petroleiros,* 348 F.2d 33 (3d Cir. 1965). Immediately necessary collision repairs were conducted in October 1960. Along with these repairs, the owner drydocked and inspected the vessel in a manner identical to its annual drydocking and inspection, which had been scheduled for March 1961. Because the next annual inspection could be postponed to October 1961, the court decided that "[t]he damages must, therefore, be reduced by the amount saved by the postponement of the next drydocking from March to October 1961." *Id.* at 39. Although the tortfeasor sought reduction of damages "by the expense of an annual drydocking," *id.,* the court restricted the reduction to the amount saved by the postponement of the annual inspection. *See generally Atlantic Refining Co.*

*v. Matson Navigation Co.,* 253 F.2d 777, 780 (3d Cir. 1958) (Hastie, J., concurring).

See also *Hines v. Sangstad S.S. Co.,* 266 F. 502, 506–07 (1st Cir. 1920), which suggested that, although the owner was under no duty to mitigate his damages by advancing later scheduled work, had the owner decided to do so, the award against the tortfeasor would have been reduced to reflect the owner's savings. *Id.* at 507 (several cited cases stand for proposition that, "if the charterer had put the ship into dry dock and had her bottom cleaned and painted at the time the repairs to the mast were made, the 2½ days might be deducted; otherwise, the charterer would be making a profit").

Similar analysis is made where a tort confers a benefit on the victim as well as causing damage. The value of the benefit is credited to the tortfeasor in assessing damages. C. McCormick, *supra* note 3, § 40, at 146.