**UNITED STATES of America, Appellant,**

v.

**AMERICAN COMMERCIAL BARGE LINE COMPANY, in personam; and M/V J.W. HERSHEY, BARGE 2914 and BARGE 2965, their apparel, tackle, and appurtenances, in rem, Appellees.**

No. 92–1333.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1992.

Decided March 23, 1993.

---

**1.** The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern and Western Districts of Missouri.

Peter F. Frost, Department of Justice, Washington, DC, argued (Stuart M. Gerson, Asst. Atty. Gen., on brief), for appellant.

Raymond L. Massey, St. Louis, MO, argued (James W. Erwin, on brief), for appellees.

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and ROSENBAUM,* District Judge.

* The Hon. James M. Rosenbaum, United States District Judge for the District of Minnesota, sitting by designation.

RICHARD S. ARNOLD, Chief Judge.

This is an admiralty case arising under the Rivers and Harbors Act of 1899, 33 U.S.C. § 408. The District Court[1] held the American Commercial Barge Line Company (the Company) strictly liable for damage to a Mississippi River lock gate, but limited its award of damages, including prejudgment interest. The United States appeals. We affirm in part and reverse in part.

## I.

On May 27, 1986, the Company's boat, the Motor Vessel J.W. Hershey (the Hershey), towed loaded barges through Lock and Dam 24 on the Mississippi River near Clarksville, Missouri. While going through, the barges struck and damaged a miter gate at the lock and dam. The Army Corps of Engineers (the Corps) operates the locks and dams on the Mississippi. It inspected the damaged gate and determined that, while it was damaged to the point of needing repair, it was still operational so long as the water level was high. The Corps decided to repair the gate soon.

Repairing a miter gate is quite an undertaking. In order not to have to close the river to navigation for any longer than necessary while making repairs, a gate is removed from its lock and replaced, temporarily, with a spare gate. The Corps followed this procedure in this case. It removed the damaged gate on July 16, 1986, and floated it by barge downstream to St. Louis. In St. Louis, the Corps fixed not only the damage caused by the Hershey's barges, but also damage from an earlier collision with the Motor Vessel Mark Roberts. The Corps also took this opportunity to perform ordinary repairs and maintenance, since there was no regular schedule for removing gates from their locks for maintenance, and to make improvements. The gate was reinstalled at Lock and Dam 24 on December 2, 1986.

Under the Rivers and Harbors Act of 1899, the Company is strictly liable for the

damage the Hershey and its barges caused to the gate. This point was never contested. The Corps sent the Company a bill for $148,398.67. This bill charged the Company with the entire cost of removing the gate, replacing it with a spare, and reinstalling it on the lock after it was repaired (referred to as the "pulling and replacing" cost), as well as the cost of actually repairing it. The Company objected to this amount as unreasonable, and the government sued.

After a bench trial on the single question of the amount of the United States' damages, the District Court found "the fair and reasonable cost of pulling and repairing gate four was $65,743.66." *United States v. American Commercial Barge Line Co.*, No. 88–1793–C–7, slip op. 19 (E.D.Mo. Sept. 30, 1991). Additionally, the Court held that the United States could not charge the Company the full amount because the damage from the Hershey's barges did not require the immediate pulling of the gate. *Id.* at 14. The Court divided the cost among the different types of work done on the gate, finding that the damage from the Hershey collision accounted for only 20.3% of the work and, therefore, the Company was liable for $13,345.96 of the pulling and replacing cost, its proportionate share. The cost of actually repairing the damage from the Hershey collision, $34,795.67, is not an issue on appeal.

After the District Court entered its judgment awarding the United States $50,641.63 with prejudgment interest, the Company moved the Court to amend its judgment. On October 16, 1989, the Company had made an offer of judgment of $80,000.00 plus accrued costs to the United States, pursuant to Rule 68 of the Federal Rules of Civil Procedure, which the United States rejected. When the Company called these and other facts to the Court's attention, the Court amended its judgment to reflect the United States' obligation to pay the Company's costs incurred after the date of the offer. The Court also amended its judgment to deny the United States prejudgment interest after October 16, 1989. This denial of prejudgment interest is the second issue on appeal.

## II.

The United States argues that the entire cost of removing and replacing the damaged gate should be charged to the Company. In support of this proposition, the United States cites *Bouchard Transportation Co. v. The Tug OCEAN PRINCE*, 691 F.2d 609 (2d Cir.1982). The Company says this cost was properly divided by the District Court and also cites *Bouchard*. Neither party cites any decision of this Court which bears on this issue, but both agree that drydocking cases, such as *Bouchard*, provide a useful analogy. We agree.

In *Bouchard* a barge was damaged when it coasted into the tug that was towing it, the Ocean Prince. The owners of the barge immediately sent it to be "gasfreed"—"a prerequisite to the performance of welding and other repairs." *Id.* at 610. The barge was then put in drydock, where the collision damage was repaired, along with other work which was originally scheduled to be done in drydock two months later, called "owner's work." *Id.* at 610–11.

The Second Circuit held that because the damage to the barge from the collision with the Ocean Prince required immediate repair, the owners of the Ocean Prince were liable for the cost of gasfreeing the barge "to the extent that it was necessary to repair the collision damage." *Id.* at 615. That court also allowed Bouchard to charge the tug owners for that portion of the drydock time used to repair the collision damage. *Id.* at 614.

The United States urges us to consider the cost of pulling and replacing the damaged miter gate to be like the cost of gasfreeing Bouchard's barge. It claims that the test for deciding whether or not it can charge the whole cost to the Company is whether the pull and replacement was done as part of a regular maintenance schedule, not caused by the collision. If not, then the Company would bear the full cost. The Company argues that the correct test, as applied in *Bouchard*, is wheth-

er the collision damage required immediate repair. If so, and if removing the gate from the lock was necessary to make those repairs, then the Company bears the full cost.

We have carefully studied the *Bouchard* opinion, and considered the other Second Circuit cases discussed in the opinion. The Second Circuit is the locus of a great deal more admiralty litigation than this Circuit, and we view that Court's opinions with special respect. In addition, Judge Leval's opinion in *Bouchard* is both closely analyzed and lucid. We find it persuasive. Our reading of *Bouchard* supports the company's position in the present appeal. The key passage in the opinion reads as follows:

> The difficulty here attaches to losses and costs that are commonly attributable both to the repair of the tort damage and to owner's work. As to such jointly caused ... losses, the owner's entitlement to damages has been held to turn on whether or not the collision damage required immediate repair, taking out of service a vessel [here, a gate] which otherwise would have been in service.... If ..., collision repairs are immediately necessary, the owner may conduct his own repairs at the same time, and is entitled to an award [for expenses] ... common to both the collision and owner's repairs.

*Bouchard,* 691 F.2d at 612–13.

So the question comes down to one of fact: did the Hershey's collision with the gate require the immediate pulling and replacing of the gate? The issue is somewhat complicated by the fact that the Corps of Engineers has no regular schedule for pulling and replacing, perhaps because of the lack of appropriated funds. It is not possible to say, therefore, that the pulling of the gate could have waited for the next regular time for repairs, there being no such regular time. The key to the *Bouchard* test, however, in our view, is the word "immediate." If, after the collision, the gate did not need to be pulled immediately, but rather could have been (or, as in this case, actually was) left in service, it is

not fair to charge the Hershey for the entire cost of pulling and replacing the gate. The Hershey, instead, should bear only its own proportional share of the costs, leaving the owner to pay for ordinary wear and tear and for the damage caused by the previous collision (absent any efforts to recover this damage from the vessel involved in the previous collision). Here, the District Court found as a fact that the collision did not create an immediate need to pull and replace the gates. This finding is not clearly erroneous, and we therefore affirm the decision of the District Court to award the United States, as against the Hershey, only a proportionate share of the costs of pulling and replacement.

### III.

■ The second issue before us is whether the District Court erred in cutting off the United States' prejudgment interest after October 16, 1989, the date the company made an offer of judgment under Rule 68 of the Federal Rules of Civil Procedure. The United States says this was error because an offer of judgment should be considered only when determining costs properly so called, and because, at least in admiralty cases, prejudgment interest is considered part of a plaintiff's damages. Therefore, says the United States, it was error to allow the offer of judgment to limit its recovery.

Whether to award prejudgment interest is within the discretion of the District Court. As always, however, the word "discretion" does not mean that the Court may simply do whatever it wishes. "Discretion" refers to an exercise of informed judgment in accordance with appropriate criteria, but with a zone of choice within which the trial court's decision will not be disturbed. In admiralty cases, prejudgment "interest should be granted unless there are exceptional or peculiar circumstances." *Mid–America Transportation Co. v. Rose Barge Line, Inc.,* 477 F.2d 914, 916 (8th Cir.1973). The phrase "exceptional or peculiar circumstances" has been fur-

ther defined. "The exceptional or peculiar circumstances justifying denial of interest include delays in bringing or prosecuting the suit by the injured party." *Id.* at 916. Here, the government could have settled the case for $80,000, considerably more than the ultimate award, and, if it had done so, it would have had its money long ago. In fairness, this might seem like just the sort of exceptional or peculiar circumstance that would justify the denial of prejudgment interest. Rule 68, however, refers in its text only to "costs," by which we understand costs properly so called, like a filing fee or witness fees. Prejudgment interest is not a "cost" in this narrow sense. It is part of the damages suffered by the plaintiff. We have held that the refusal of an offer of settlement "would be cause for denying prejudgment interest only if the United States was dilatory in bringing suit or if the suit was frivolous." *United States v. Motor Vessel Gopher State*, 614 F.2d 1186, 1190 (8th Cir.1980). Here, there is no contention that the suit was frivolous. Defendant did argue below that the government had delayed unreasonably in bringing suit, but this argument was rejected by the District Court, and defendant does not argue on appeal that this rejection was error.

We take it, though, that the reference in *Gopher State* to delay in bringing suit was not intended to be an exhaustive or technically complete description of instances in which delay could justify denial of prejudgment interest. Indeed, at just this point in the opinion, *Gopher State* cites *Mid–America Transportation Co. v. Rose Barge Line, supra,* and that case, as we have seen, says that delays in prosecuting suit, as well as those in bringing it, can justify denial of prejudgment interest. This is how defendant justifies the District Court's denial of prejudgment interest in the present case. The government made two motions for continuance, defendant says, thus causing a delay in the trial, and this circumstance, in fact, is cited by the District Court in support of its decision. As the government points out, however, only one of these motions for continuance was granted, and the delay resulting from the granting of that motion appears to have been only five months. The District Court denied prejudgment interest completely from the time of the rejection of the Rule 68 settlement offer. We think this was an abuse of discretion. If prejudgment interest is to be denied, and that decision is for the District Court to make in the first instance, the denial should be limited to the period of time attributable to government-caused delays in the trial setting. The date of the rejection of the Rule 68 offer is not relevant to the computation of this time period.

Under the circumstances, the best course is to remand this case for further proceedings consistent with this opinion. On remand, the District Court should leave out of account the rejection of the Rule 68 offer. It should reconsider its denial of prejudgment interest, and, if it decides to deny any such interest, should limit its action to that period of time caused by government-produced delays in the trial setting.

### IV.

Insofar as the award of damages is concerned, the judgment is affirmed. So much of the judgment as relates to denial of prejudgment interest is reversed, and the cause remanded for further proceedings consistent with this opinion.

It is so ordered.